# In the
# United States Court of Appeals
## For the Seventh Circuit

_____

No. 04-4030

RALPH OVADAL,

*Plaintiff-Appellant*,

v.

CITY OF MADISON, WISCONSIN,
RICHARD WILLIAMS, CHRIS
PAULSON, and PATRICK GRADY,

*Defendants-Appellees.*

_____

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 04 C 0322 S—**John C. Shabaz**, *Judge.*

_____

ARGUED APRIL 13, 2005—DECIDED JULY 19, 2005

_____

Before EASTERBROOK, KANNE, and SYKES, *Circuit Judges.*

KANNE, *Circuit Judge.* Ralph Ovadal participated in a protest against homosexuality on a pedestrian overpass above a busy highway in Madison, Wisconsin. When drivers, angry with the message displayed, began driving erratically and causing congestion on the highway, police officers stepped in and threatened Ovadal with arrest if he did not end the demonstration. Ovadal was ultimately banned from any such protest on any Beltline pedestrian overpass. The district court found that the restriction on

speech was justified and granted summary judgment in favor of the defendants. We find that there exist genuine issues of material fact, so we reverse and remand.

## I.  History

Ralph Ovadal is a Christian minister who wishes to share his religious views with the public through the use of signs and banners. At about 4:20 P.M., on Tuesday, September 2, 2003 (the day after Labor Day), Ovadal and several of his colleagues gathered on a pedestrian overpass spanning the Beltline highway in Madison, and displayed large signs—held by protesters above the sides of the over-pass—which read, "Homosexuality is sin" and "Christ can set you free." The lettering on the bright yellow signs and banners was very large so that the messages would be visible from long distances. Ovadal chose the Beltline be-cause it is a very busy highway used by both local and out-of-state drivers and, therefore, his audience would be larger and more diverse than on other local roads. Also, the fenced-in pedestrian overpasses were deemed safe locations for these demonstrations because they are twenty feet above the road.

While the protest was taking place, Curtis Fields, a Madison police officer, noticed substantial congestion on the Beltline in the area where Ovadal's signs were displayed. Officer Fields reported this traffic problem to dispatch and was informed that several people had already called in complaining about the protest and stating that they had been forced to slam on their brakes in order to avoid accidents. Some drivers responded to the protesters with angry hand gestures, and one woman even came up through her sunroof to yell at Ovadal.

Officer Fields made an effort to determine whether Ovadal and his group had a constitutional right to conduct their protest on the overpass. Fields asked Deputy District

Attorney Judy Schwaemle for advice, and she opined that the protesters could be ordered to relocate if the officers felt that the protest was creating unsafe driving conditions. Fields then approached Ovadal and asked him to take his demonstration elsewhere. He told Ovadal that the police had received several calls "from disgruntled people. It's causing a disturbance."[1] A short time later, Fields conferred with another officer and notified Ovadal that he would be allowed to stay on the overpass. Then, after the protest had continued for approximately 30 more minutes, at about 5:20 P.M., Fields returned and advised Ovadal that he would have to leave the area after all. Fields told Ovadal that there had been some reports of near accidents and that he was under orders to have Ovadal leave the area. Fields informed Ovadal that if he did not leave the overpass he would be arrested for disorderly conduct because individuals were "disturbed" by Ovadal's message. In order to clarify, Ovadal asked, "So, under threat of arrest, everyone has to leave the bridge because there have been several anonymous complaints?" Officer Fields responded in the affirmative, and Ovadal left the overpass.

As he was leaving, Ovadal encountered Sergeant Chris Paulson, who had been in contact with Officer Fields. Paulson told Ovadal that the police had received several reports from drivers who were angered by the signs and had been forced to slam on their brakes. Paulson denied Ovadal's request to display the signs so that only the slow moving lanes could see them. Ovadal asked whether there was any time of day when he would be permitted to display the signs on the overpass, and Paulson informed him that the overpass would not ever be suitable for his demonstration. Ovadal asked to speak to someone higher in the line of

---

[1] One of Ovadal's colleagues videotaped all of the conversations that Ovadal had with the police officers that are relevant to this litigation.

command and Paulson stated that he was in charge. Upon further questioning about whether there was any time of day that Ovadal could protest on the overpass, Paulson told Ovadal that he and the Madison Police Department did support free speech, but that "[t]he reality is on this particular bridge, an overpass on a Beltline where the traffic . . . can be intense, this is my decision. The answer is no."

Ovadal later contacted the Madison Police Department to see if the policy prohibiting his protest could be changed. Captain Silverwood told Ovadal that he would forward the request for clarification of the policy to the City Attorney. The City Attorney did not respond to Ovadal's request.

On Saturday October 11, 2003, at about 8:30 A.M., Ovadal and his colleagues set up another protest on a pedestrian overpass which they believed to be outside the city limits of Madison. Ovadal had protested on this overpass previously without incident. However, later that morning, Madison Police Sergeant Patrick Grady approached the protesters and asked them to leave. Sergeant Grady told Ovadal that his group "present[s] a traffic hazard here. You've got people going 60, 70 miles an hour there and they're looking up and seeing you." Grady informed Ovadal that he would not be allowed to display signs on any pedestrian overpasses in the Madison area.

On October 31, 2003, Ovadal wrote a letter, through counsel, to Madison Police Chief Richard Williams explaining his belief that the policy banning signs on the pedestrian overpasses deprived him of his constitutional rights. Williams did not respond to Ovadal's letter. Although Ovadal still wishes to display his signs on the overpasses, he has not done so because he is afraid he will be arrested. Therefore, he brought this lawsuit under 42 U.S.C. § 1983 asking for injunctive relief, declaratory relief, and damages.

## II. Analysis

This case comes to us on a grant of summary judgment in favor of the defendants. The case is thus subject to *de novo* review, and we will review the record in the light most favorable to Ovadal, the nonmoving party. *See Grayson v. City of Chicago*, 317 F.3d 745, 749 (7th Cir. 2003). Summary judgment is properly granted when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

Ovadal brings this suit against the City of Madison, Richard Williams in his official capacity as police chief, and Chris Paulson and Patrick Grady individually and in their official capacities as police officers. In order to establish liability against the city under 42 U.S.C. § 1983, Ovadal must show that: "(1) he suffered a deprivation of a federal right; (2) as a result of either an express municipal policy, widespread custom, or deliberate act of a decision-maker with final policy-making authority for the City; which (3) was the proximate cause of his injury." *Ineco v. City of Chicago*, 286 F.3d 994, 998 (7th Cir. 2002). To prove that the individual officers are liable, Ovadal must show that "(1) he was deprived of a federal right and (2) that the deprivation was imposed upon him by one or more persons acting under color of state law." *Id.* at 997-98.

Ovadal argues that the Wisconsin disorderly conduct statute is unconstitutional as applied to him in this instance because it is vague and it was applied specifically to curb speech that is protected by the First Amendment. The statute prohibits people from engaging "in violent, abusive, indecent, profane, boisterous, unreasonably loud or otherwise disorderly conduct under circumstances in which the conduct tends to cause or provoke a disturbance . . . ." Wis. Stat. § 947.01. Although it is clear that Ovadal's conduct does not fall into any of the statute's enumerated

categories, the defendants claim that Ovadal's protests constituted "otherwise disorderly conduct." They point out that even if typical protest activities would not fall under the statute's prohibitions, the surrounding circumstances are of utmost importance when determining whether conduct is "disorderly." *City of Oak Creek v. King*, 436 N.W.2d 285, 288 (Wis. 1989). The Wisconsin Supreme Court has explained that in cases where convictions resulted from "otherwise disorderly conduct," it was because the specific conduct was inappropriate in light of the particular circumstances involved. *Id.* at 289. The defendants argue that because conducting a protest on a pedestrian overpass distracts drivers and creates a safety hazard, it is inappropriate and can be punished under the disorderly conduct statute.

While it is true that the surrounding circumstances must be considered, it is also true that the city cannot threaten to prosecute protesters under this statute if the threats are nothing more than a pretext for stopping unpopular, yet protected, speech. *See Zwicker v. Boll*, 270 F. Supp. 131, 135 (W.D. Wis. 1967), *aff'd*, 391 U.S. 353 (1968). "[O]ne may not be convicted for disorderly conduct . . . merely because he espouses unpopular ideas or merely because others are thereby stimulated to commit disorderly acts; on the other hand, conduct which is in fact disorderly is not insulated because it is perpetrated while engaged in a protest demonstration." *Id.* Conduct is usually considered disorderly when the acts or words are "of a nature to corrupt the public morals or to outrage the sense of public decency . . . ." *King*, 436 N.W.2d at 288 (citation omitted).

A law or policy is void for vagueness if it "either forbids or requires the doing of an act in terms so vague that people of common intelligence must necessarily guess at its meaning and differ as to its application." *Connally v. Gen. Const. Co.*, 269 U.S. 385, 391 (1926). The Wisconsin Supreme Court has considered the disorderly conduct statute in the

context of protests and "determined that the statute sufficiently identified the type of behavior which the legislature intended to be contrary to law and that the statute was not subject to an attack for vagueness." *State v. Zwicker*, 164 N.W.2d 512, 517 (Wis. 1969). "The fact that a statute fails to itemize with particularity every possible kind of conduct which would violate such statute does not make it constitutionally vague." *State v. Givens*, 135 N.W.2d 780, 784 (Wis. 1965). Whether Ovadal's peaceful protest rises to the level of disorderly conduct because it took place on a Beltline overpass is an open question of state law that we need not address, but we find that the disorderly conduct statute is not unconstitutionally vague as applied to him.

Ovadal's use of signs and banners to express a religious viewpoint is at the core of the speech that the First Amendment protects. *See Boos v. Barry*, 485 U.S. 312, 318 (1988); *Thomas v. Collins*, 323 U.S. 516, 537 (1945). There is no question that the morality of homosexuality is a contentious issue, but unpopular speech remains protected by the First Amendment; in fact, "[i]f there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989).

This is not to say, however, that Ovadal's right to express his views is without limit. *See Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 799 (1985). The extent of limitation that is permissible is determined by the forum in which the speech takes place. *Frisby v. Schultz*, 487 U.S. 474, 479 (1988). The district court found that the pedestrian overpass was a traditional public forum because it was a portion of a public sidewalk. *See United States v. Grace*, 461 U.S. 171, 179 (1983). "Time out of mind, public streets and sidewalks have been used for public assembly and debate, the hallmarks of a traditional public forum."

*Frisby*, 487 U.S. at 480 (internal quotations omitted). We agree with the district court's conclusion that "[a] public sidewalk does not lose its status as a traditional public forum when it passes over a highway overpass." All public sidewalks "are held in the public trust and are properly considered traditional public fora." *Frisby*, 487 U.S. at 481. Thus, as the district court correctly determined, Ovadal's protest occurred in a public forum.

When speech takes place in a traditional public forum, it receives heightened constitutional protection. The government may restrict the time, place, and manner of the speech, but only if the restrictions are content-neutral, narrowly tailored to serve a significant government interest, and leave open ample alternative means of communication. *Id.* If a restriction is based on the content of the speech, it is unconstitutional unless the state can prove that the regulation is necessary to serve a compelling state interest and that the regulation is narrowly drawn to achieve that end. *Id.* So, in order to determine the appropriate level of scrutiny, it is necessary to first decide whether the restriction is based on the content of the speech. *Id.*

The city argues that prohibiting Ovadal's protest on any Beltline overpass was a proper place and manner restriction on his speech. The officers treated Ovadal respectfully, the city insists, and ended the protest only because it created a safety hazard, not because the officers disagreed with the message. Ovadal, however, emphasizes that every proffered justification for ending the protest is directly related to the reactions of the persons viewing the signs. For example, Officer Fields told Ovadal that he had to leave the bridge because several drivers, "disturbed" by the messages on the signs, had called in and complained about the protest. In addition, Sergeant Paulson told Ovadal that the police had received reports from drivers who were angered by the signs and that the officers were concerned that drivers would "slam on their brakes because they're upset."

If the city had a policy that prohibited not just Ovadal's, but all protests and all signs on all Beltline overpasses, this could certainly be a legitimate place and manner restriction because it would be clearly content-neutral. However, the city adamantly refuses to admit that such a policy exists. Instead, it insists that signs are prohibited only if they impair traffic safety.[2] The officers are permitted to decide on an ad hoc basis whether to allow the protest to continue depending on how drivers react to the signs on the pedestrian overpass.

"Listeners' reaction to speech is not a content-neutral basis for regulation." *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 134 (1992). "Speech cannot . . . be punished or banned, simply because it might offend" those who hear it. *Id.* at 134-35. It cannot be denied that drivers who yelled, gestured, and slammed on their brakes when they saw Ovadal's signs created a safety hazard on the Beltline. However, it is the reckless drivers, not Ovadal, who should have been dealt with by the police, perhaps in conjunction with an appropriate time, place, and manner restriction on Ovadal. The police must preserve order when unpopular speech disrupts it; "[d]oes it follow that the police may silence the rabble-rousing speaker? Not at all. The police must permit the speech and control the crowd; there is no heckler's veto." *Hedges v. Wauconda Cmty. Unit Sch. Dist. No. 118*, 9 F.3d 1295, 1299 (7th Cir. 1993).

If the restriction of Ovadal's speech was content-based, the city must prove that prohibiting Ovadal from protesting on pedestrian walkways above the Beltline is narrowly tailored and necessary to serve a compelling state interest.

---

[2] It appears that no group other than Ovadal's has ever attempted a demonstration on a Beltline overpass. Thus, we do not know whether the police would have allowed other demonstrations to continue.

Ovadal concedes that the city has an interest in protecting public safety and promoting the free flow of traffic on public streets. *See, e.g.*, *Madsen v. Women's Health Ctr.*, 512 U.S. 753, 768 (1994). But, the city may still only regulate speech "if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of [the government's legitimate] interest." *Members of City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 805 (1984).

There remain genuine issues of material fact which bear on whether Ovadal was deprived of his First Amendment right to free speech by an express policy or widespread custom of the City of Madison and certain police officials. While there is no question that Ovadal has been completely banned from all Beltline pedestrian overpasses in the Madison area, the issue remains as to whether the ban was narrowly tailored and content-neutral. Did the police impose a "heckler's veto" and would the same absolute "ad hoc" ban have been imposed on any display occurring on a Beltline pedestrian overpass? Was it possible that the city could have imposed a ban on protests occurring on certain days of the week, during certain times of day, or depending on traffic conditions, or was an absolute ban the only option available to the city under the circumstances? The key question is whether the city's rule that no protests may take place on overpasses when those protests cause a traffic hazard is capable of content-neutral application, or whether the city has imposed a content-based and impermissible "no-Ovadal-on-overpasses" rule. Matters of material fact such as these need to be resolved in order to determine whether Ovadal's First Amendment rights have been violated; therefore, we must remand this case to the district court.

### III.  Conclusion

For the reasons set forth above, the district court's grant of summary judgment in favor of the defendants is REVERSED, and this case is REMANDED for further proceedings.


A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*