In the

# United States Court of Appeals
## For the Seventh Circuit

No. 05-4723

RALPH OVADAL,

*Plaintiff-Appellant,*

*v.*

CITY OF MADISON, WISCONSIN,
RICHARD WILLIAMS,
CHRIS PAULSON, and
PATRICK GRADY,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 04 C 322—**John C. Shabaz**, *Judge.*

ARGUED SEPTEMBER 22, 2006—DECIDED NOVEMBER 20, 2006

Before EASTERBROOK, KANNE, and SYKES, *Circuit Judges.*

KANNE, *Circuit Judge.* The plaintiff sued the City of Madison and various officers of the Madison Police Department (collectively "Madison") under 42 U.S.C. § 1983 alleging that his constitutional rights of free speech and freedom of religion were infringed. The district court granted summary judgment to Madison in a Memorandum and Order dated November 8, 2004. We remanded so that the district court could develop some aspects of the factual record. *Ovadal v. City of Madison*, 416 F.3d 531 (7th Cir. 2005). After a bench trial, the district court entered judg-

ment in favor of the defendants. *Ovadal v. City of Madison*, No. 04-C-322-S, 2005 WL 3434402 (W.D. Wis. Dec. 13, 2005). The plaintiff appeals. We affirm.

## I. HISTORY

Mr. Ovadal began this, his most recent foray into the federal courts, after events that occurred in Madison in the Fall of 2003. On September 3 and October 11 of that year he organized two small demonstrations to express his opposition to homosexuality. His chosen fora for these demonstrations were overpasses where city sidewalks crossed the Madison Beltline freeway.[1] On both occasions the demonstrations had a noticeable effect on traffic below. On both occasions the Madison police arrived and forced Ovadal to move from the overpasses on the grounds that his activities were causing a traffic hazard for the motorists below him. Ovadal brought suit seeking damages as well as declaratory and injunctive relief.

As we previously held in this case, Ovadal's demonstrations are well within the core of the types of speech and acts that are protected by the First Amendment and his chosen location is a traditional public forum. *Ovadal*, 416 F.3d at 536. Madison can make time, place, or manner restrictions on such speech only if they are content-neutral, narrowly-tailored to serve a significant government interest, and leave open ample alternative means of communication. *Id*. Alternatively, Madison can make content-based restrictions on such speech only if necessary to accomplish a compelling interest and narrowly tailored to that end. *Id*. The primary

---

[1] The Beltline is a restricted access freeway. In the area where Ovadal was protesting, the average speed of the traffic exceeds 60 miles per hour, with some traffic traveling as fast as 85 miles per hour.

issue of contention between the parties on remand and on this appeal has been whether Madison's actions were content-neutral.

Ovadal argues that a policy that restricts speech based on its effect on traffic is not content-neutral. Arguing backwards, he reasons that traffic congestion and motorist complaints are a function of motorists' reactions to his message, and that motorists will react to create a traffic hazard when confronted with a message that they do not accept. This, in Ovadal's view, gives the motorists a "heckler's veto" over his protected speech. *See, e.g.*, *Forsyth County, Ga. v. Nationalist Movement*, 505 U.S. 123 (1992).

Madison, however, contends that the decisions to remove Ovadal from the overpasses were not, even indirectly, driven by the content of his speech. The defendants contend that the police responded to a traffic hazard that was caused not by the content of Ovadal's signs but by the fact that he was creating a "spectacle" over heavy high-speed traffic. Madison argues that regardless of whether the first person who looked up at the band of protesters and tapped their brakes agreed with Ovadal's message or abhorred it, that person set off a chain reaction: traffic became increasingly more dangerous and many drivers were left angry.

The district court conducted a bench trial to resolve this factual dispute and entered judgment in favor of Madison. The court specifically entered findings of fact that the traffic congestion was not caused by (or a derivative of) the content of Ovadal's speech, but rather was caused by the presence of the band of protesters and motorists' reactions to their presence. *Ovadal*, No. 04-C-322-S, 2005 WL 3434402, at *1-2 (W.D. Wis. Dec. 13, 2005). The court entered conclusions of law that Madison's actions were content-neutral, were necessary to serve the compelling government interest of motorist safety, and left ample alternatives to Ovadal. *Id.* at *2-3.

Seven days after the bench trial, Madison Ordinance 05-00193 took effect, and amended the compiled Madison City Ordinances to prohibit any person to "display, place, erect, post, maintain, install, affix, or carry any street graphic, including a hand-carried sign" on highway overpasses such as those at issue in this lawsuit. Madison City Ord. § 31.04(6)(m). The ordinance bans any such display, provided that it is visible from the highway. *Id.* The ban is limited to freeways and expressways, or controlled access highways with a speed limit greater than forty miles per hour. *Id.*

On appeal, Ovadal seeks to have "Madison's traffic hazard policy" declared unconstitutional and enjoined from enforcement, and seeks damages for the two occasions that he was forced off the bridges. He alleges that there is either an unwritten policy that is directed at him—a "no-Ovadals-on-overpasses rule"—or alternatively that there is a policy that leaves the existence of a traffic hazard to the judgment of a police officer. This policy, he argues, gives too much discretion to the police, is incapable of content-neutral application, is not narrowly tailored, and does not serve a compelling state interest.

## II. ANALYSIS

### A. *Declaratory and Injunctive Relief*

The Constitution gives the federal courts jurisdiction over "cases" and "controversies." U.S. Const. Art. III § 2, cl. 1. When circumstances change during litigation such that there is no longer any case or controversy, the case is moot. *Powell v. McCormack*, 395 U.S. 486 (1969). If a defendant voluntarily ceases the behavior that is complained of, the case can be rendered moot "if subsequent events [make] it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.* 528 U.S. 167, 189

(2000) (quoting *United States v. Concentrated Phosphate Exp. Ass'n*, 393 U.S. 199, 203 (1968)).

At its heart, Ovadal's request for declaratory and injunctive relief relies on the claim that Madison had an unwritten policy that impermissibly burdened his First Amendment rights by prohibiting protests when, in the opinion of a police officer, the protests were causing a traffic hazard. He bases this belief on the fact that on the two occasions when he was forced to leave the pedestrian overpasses, the officers told him that he was being forced to move because he was causing a traffic hazard. His constitutional complaint is that this unwritten policy leaves far too much to the discretion of the police officer. He notes that what might seem to be a traffic hazard to one officer might not be for another. He also argues that by restricting speech on the basis of the observable effect on motorists, the motorists might be given a heckler's veto.

As we previously noted, "[i]f [Madison] had a policy that prohibited not just Ovadal's, but all protests and all signs on all Beltline overpasses" the restriction would be "clearly content-neutral." *Ovadal,* 416 F.3d at 536. By passing § 31.04(6)(m), the city appears to have taken our previous decision to heart. The ordinance itself is not before the court: the only significance of the ordinance is the effect that it has on any alleged unwritten policy. If the ordinance now replaces the behavior that is the subject of the complaint, making the alleged unconstitutional behavior effectively impossible, the request for forward-looking relief is moot. To put a finer edge on it: the only way that the request for declaratory or injunctive relief would not be rendered moot by the ordinance would be if Ovadal could point to some subset of expressive behavior that is currently *allowed* by the ordinance but would be *banned* by the alleged traffic hazard policy.

The parties agreed at oral argument that the behavior that started this lawsuit—carrying signs over the Beltline

freeway—is now strictly banned regardless of the time of day, the effect on the motorists below, or the noticeable effects on traffic safety. At oral argument, Ovadal claimed that the ordinance does not ban non-sign protests, nor does it ban motorist-distracting signs from bridges over other, slower speed, roads in Madison. Ovadal posits that these two activities, which are not prohibited by the ordinance but would be subject to the alleged traffic hazard policy, show that the case or controversy is still alive. But those types of activities are not before the court in this appeal. There has been no showing that Madison has ever prevented or would prevent Ovadal from marching without signs over any sidewalk or bridge in Madison. Likewise, there is no evidence that Ovadal has ever been asked to move when demonstrating from a bridge over a slow-speed roadway. Such restrictions, if they existed, would raise significant constitutional questions. But we are now three years into this litigation and the evidence, the district court's decision, and the briefs and arguments made here on appeal have not been directed at those questions or those types of behavior. If there are such instances, they are issues for a different lawsuit. It would be an advisory opinion in its worst form to use this forum to rule on the constitutionality of an alleged unwritten policy that might be used to prevent behavior that has never been the subject of the litigation at hand. Therefore, with respect to any unwritten traffic hazard policy, the request for declaratory and injunctive relief has been rendered moot by the passage of the ordinance.

## B. Damages

However, the passage of the ordinance is not dispositive of the request for damages for any constitutional violation that might have been suffered in the past. The case comes to us on appeal after a bench trial: we defer to the district

court's findings of facts unless clearly erroneous, and will review questions of law *de novo. Trustmark Ins. Co. v. Gen. & Cologne Life Re of Am.*, 424 F.3d 542, 551 (7th Cir. 2005). There are two questions before us: whether Madison violated Ovadal's constitutional rights on the two occasions in the Fall of 2003 when he was forced off the overpasses, and whether Madison violated his constitutional rights by effectively banning him from other similar protests through an alleged unwritten policy.

With respect to the two discrete incidents in September and October, the district court heard the testimony of eight witnesses and received sixteen exhibits. Without recounting the entirety of the evidence, we can summarize it as follows: Ovadal and his long-time companion Mike Foht testified that they did not see any noticeable effect on traffic, but several police officers—including a deputy sheriff who is not a defendant in the present suit— testified that traffic was impeded and dangerous. There was conflicting testimony about whether the accidents and reported near-accidents were the result of general curiosity about the activities of the protesters or whether the accidents were being caused by drivers' reactions to the message that Ovadal and Foht were displaying about homosexuality. The court received evidence about the number of calls placed to 911 regarding the traffic, and the nature of the complaints that those callers made.

In the end, the district court faced two possible factual scenarios. By one view of the evidence, Ovadal's *message* angered drivers who then reacted and were distracted from the task of driving safely, resulting in a dangerous situation that Madison needed to address. By another view of the evidence, Ovadal's *presence* on that day and under those driving conditions created a "spectacle" that led some drivers to be distracted from the task of safely navigating the Beltline and their distraction led to an escalating situation of near-accidents and anger at the traffic con-

gestion. As we noted on remand, if the findings of fact supported the first view, then the drivers were simply rabble, fuming at the content of Ovadal's rabble-rousing speech, and "[t]he police must permit the speech and control the crowd; there is no heckler's veto." *Ovadal*, 416 F.3d at 537 (quoting *Hedges v. Wauconda Cmty. Unit Sch. Dist. No. 118*, 9 F.3d 1295, 1299 (7th Cir. 1993)).

The court entered findings of fact that on the two dates in question the traffic safety problems were not caused by the content of the message on the signs that the protesters carried. *Ovadal*, No. 04-C-322-S, 2005 WL 3434402, at *1-2 (W.D. Wis. Dec. 13, 2005). Thus, the court concluded, Madison's decision to move the protesters from the bridge was not the result of the content of the speech. The evidence and testimony could certainly have supported such a finding of fact. "In weighing direct and circumstantial evidence, the trier of fact plays a particularly significant role as the arbiter of credibility: [W]e defer to the [trier of fact's] determination of witnesses' credibility." *United States v. Balzano*, 916 F.2d 1273, 1285 (7th Cir. 1990) (citations and quotations omitted). Because the district court's findings of fact are not clearly erroneous, we will not disturb them.

The final question for us is whether Ovadal's constitutional rights were violated by an alleged unwritten and widespread policy that effectively prevented him from engaging in protected speech. When we remanded the case, we noted that there was "no question that Ovadal has been completely banned from all Beltline pedestrian overpasses in the Madison area." *Ovadal*, 416 F.3d at 537. The questions on remand, or so we thought, were whether the effective prohibition was capable of content-neutral application and whether the city could have imposed a ban on protests occurring on certain days of the week, during certain times, or depending on traffic conditions. *Id.* at 537-38.

When we last considered this case, it was on appeal after a grant of summary judgment in favor of Madison. Accordingly, we viewed all facts in the light most favorable to Ovadal. *Id*. at 535. With the benefit of a trial we now have additional facts that cast doubt on the version of events that the summary judgment proceedings portrayed. For example, testimony at trial indicated that Ovadal had been on Beltline overpasses with signs at least six times before the dates in question, and had interacted with the Madison police on several of those occasions without any restriction on his activities. Tr. Dec. 12, at 17, 68-69. The only other witness that Ovadal called, his frequent partner in these demonstrations Mike Foht, testified that he had been on Beltline overpasses between ten and twelve times in the years prior to the incidents in question and despite frequent interactions with Madison police had never been forced to move. Tr. Dec. 12, at 92-93. We find it particularly telling that on November 8, 2003 (*after* the events that led Ovadal to file this suit in which he alleges that he was "chilled and deterred" from exercising his First Amendment rights) Ovadal and Foht were back on a bridge over the Beltline. Tr. Dec. 12, 79-80. Once again, they interacted with a Madison police officer, and the officer informed them that they were free to continue their protest. *Id*. The facts, no longer viewed in a light most favorable to Ovadal, do not support the allegations that there was ever any absolute ban on Ovadal protesting from bridges or that he was chilled and deterred from exercising his rights.

### III. CONCLUSION

In summary, the passage of the city ordinance has made any claim for declaratory and injunctive relief moot because the alleged violations cannot be repeated. We defer to the district court's findings of fact that the actions of the defendants on the specific dates in question were not content-based restrictions on speech. The evidence at trial does not support any allegation that there was a general

unwritten policy that placed content-based prohibitions on Ovadal's speech. The record indicates that Ovadal was not chilled or deterred from exercising his First Amendment rights. Therefore, there has been no constitutional harm cognizable under 42 U.S.C. § 1983. Accordingly, the judgment of the district court is AFFIRMED.

A true Copy:

Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*