In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 15-1932

CONSTRUCTION AND GENERAL LABORERS' LOCAL UNION NO. 330 and KELLY BUSS,

*Plaintiffs-Appellants*,

*v.*

TOWN OF GRAND CHUTE, WISCONSIN,

*Defendant-Appellee*.

_____

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 14-C-455 — **William C. Griesbach**, *Chief Judge*.

_____

ARGUED NOVEMBER 6, 2015 — DECIDED AUGUST 19, 2016

_____

Before WOOD, *Chief Judge*, and POSNER and EASTERBROOK, *Circuit Judges*.

EASTERBROOK, *Circuit Judge*. Rats. This case is about rats. Giant, inflatable rats, which unions use to demonstrate their unhappiness with employers that do not pay union-scale wages. Cats too—inflatable fat cats, wearing business suits and pinkie rings, strangling workers. Here is what they look

like, as deployed during a labor dispute in the Town of Grand Chute, Wisconsin:





As the pictures show, the rat and the cat are staked to the ground, to prevent the wind from blowing them away. Those stakes led to this litigation.

Grand Chute forbids private signs on the public way. Municipal Code §535-106C. Another section defines signs to mean "[a]ny structure, part thereof, or device attached there-

to" that conveys a message. Municipal Code §535-105. Picket signs and sandwich boards are lawful under this definition, and the Town did not interfere with the Union's use of them. But the Union inflated its rat and cat in the median of a highway, and because they were staked to the ground the Town treated them as structures.

If picketers had held them down by ropes, there would not have been a problem under the Town's rules. Likewise if they had been inflated with helium and floated six inches above the ground. The Town suggested that the protesters mount the cat and rat on a flatbed truck, which would not be a structure; the Union declined. Staked to the ground on the public way, as they were, they were forbidden. The Union removed them when directed to do so and filed this suit under 42 U.S.C. §1983, contending that the local ordinance violates the Constitution's First Amendment, applied to the states through the Fourteenth.

The district court denied the Union's motion for a preliminary injunction, 2014 U.S. Dist. LEXIS 59340 (E.D. Wis. Apr. 29, 2014), and about a year later entered summary judgment for the Town. The Union has appealed from the second order only.

Unfortunately, neither the district court nor the parties considered the possibility that this case may be moot. By the time the court entered summary judgment, the construction project that led to the use of demonstrative rats and cats had been completed, and the Union was no longer picketing. It has not asked for an award of damages, which led us to wonder whether we have a live controversy. At oral argument counsel for the Union said yes, because a dispute might crop up again if the Union decides to demonstrate

against a future construction project in Grand Chute. Yet for a case to remain live because it is capable of repetition, there must be "a reasonable expectation that the same complaining party would be subjected to the same action again." *Weinstein v. Bradford*, 423 U.S. 147, 149 (1975). The record does not contain any information about this likelihood. How many construction projects built with non-union labor have caused labor disputes in Grand Chute? Are more such projects planned? And even if such a project is built, and a dispute recurs, *this* suit may still be moot if the controversy about that future project would not evade review. Labor disputes often are short-term affairs, but many are long lived. Even for short-term disputes, the possibility of damages keeps a case alive.

And there is one more problem: between the district court's order denying interlocutory relief and its order granting summary judgment, the Town amended its code (see Ordinance 2015–01) and changed the definition of a sign. The citations in this opinion are to pre-amendment language and numbering. None of the parties alerted us (or the district court) to this fact, which potentially affects the proper disposition if the controversy remains live.

We cannot decide this suit on the merits without being confident that we have a justiciable controversy. The district court needs to take another look at it. If the Union persists in abjuring damages, the district court must determine whether the probability of a fresh dispute between this union and Grand Chute is high enough—and the risk that it would be over too quickly to allow judicial review also high enough—to satisfy the "capable of repetition yet evading review" proviso to the mootness doctrine. Then it must address the va-

lidity of the Town's current ordinances, rather than one that was changed before the entry of final judgment.

Although we cannot resolve the merits while the presence of a justiciable controversy is in doubt, we can say a few words about other issues that the district court needs to consider if the controversy remains live.

*Members of City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789 (1984), holds that a city may ban all private signs (including political ones) from the public way. Grand Chute has done just that—on paper. That the city allows its own signs (e.g., "No Left Turn") does not require it to allow private structures on public property, whether or not the private structure is designed to convey a message. See, e.g., *Pleasant Grove v. Summum*, 555 U.S. 460 (2009).

The Union cannot avoid *Taxpayers for Vincent* by observing that the rat and cat are symbolic speech, because *Clark v. Community for Creative Non-Violence*, 468 U.S. 288 (1984), holds that a public body may forbid the "action" component of symbolic speech, provided that it does not discriminate against disfavored viewpoints. In *Community for Creative Non-Violence* the National Park Service forbade all tents on the Mall in Washington, D.C., and the Court held that this was valid even though a group wanted to camp out to make a political point.

The ordinances in Grand Chute are comprehensive and content-neutral, and decisions such as *Community for Creative Non-Violence* and *Taxpayers for Vincent* hold that a governmental body need not make ad hoc exceptions to such rules. To the contrary, limiting official discretion about who is entitled to speak is a vital goal of the Supreme Court's jurispru-

dence under the First Amendment. See *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 130–31 (1992); *Niemotko v. Maryland*, 340 U.S. 268 (1951). The sort of ad hoc exception that the Union wanted Grand Chute to make (on the ground that the rat and cat did not jeopardize traffic safety and were only temporary) not only would have transgressed the rule against open-ended discretion but also would have created a form of content discrimination. See *United States v. Stevens*, 559 U.S. 460, 470–71 (2010); *Houston v. Hill*, 482 U.S. 451, 465–67 (1987). That in turn would have called into question the Town's entitlement to enforce its ordinance against anyone. See, e.g., *Reed v. Gilbert*, 135 S. Ct. 2218 (2015).

The Union maintains, however, that the Town has undercut its own ordinance by selective enforcement, permitting messages of which it approves while enforcing the ordinance against unions and other unpopular speakers. If the ordinance *in operation* discriminates according to the content of speech, then only a compelling justification could save it, and the Town has not argued that it has the sort of justification that would authorize content discrimination.

The district court's opinion denying the Union's motion for a preliminary injunction did not address in any detail how the ordinance is being administered. The opinion granting summary judgment for the Town took up that topic but did not resolve it.

The Union pointed to a number of message-bearing structures that it believes violate the ordinance. The Town replied that some of these are outside its borders and that others are not on the public way. Instead of deciding who is right, the district court wrote: "Even assuming these signs did violate the ordinance … they do not prove the Town's

enforcement against the rat was arbitrary, and we cannot infer from evidence of non-enforcement that an actual enforcement was for an invidious reason." That would have been an appropriate response if this were, say, a dispute about zoning variances. But it is not an adequate answer to a contention that a unit of government has allowed some speech and stifled other speech, choosing which ideas can be conveyed. *Reed* tells us that content discrimination is almost always forbidden. If this suit is live, the Union's claim of content discrimination cannot be dismissed on the ground that the Town lacks an "invidious reason" for preferring some speech over other speech.

The Union also pointed to a number of signs posted on or near the Town's fire stations. The district court thought these irrelevant for two reasons: first, "the signs at issue belonged to the Town's own employees"; second, one of the Town's managers testified that a particular sign at a fire station "could be legal" because it may not have been a structure. Once again, neither of these responses is satisfactory in a suit that presents a claim of content discrimination. *Summum* and similar decisions hold that a public body may engage in speech on its own behalf without offering private citizens equal access to public property. But *Summum* does not hold that a unit of government may favor speech by its workers over speech by other persons. That would be clear enough if the fire department's workers had posted signs boosting the Mayor's re-election or condemning labor unions, while the Town resolutely blocked opposing perspectives on the public way. As for "it could be legal": the district judge needs to determine whether the signs were (or are) legal under the ordinance. If the Town is distinguishing among speakers covered by the ordinance, it must meet the Supreme Court's

standards for content discrimination. That the Town's police did not tell the Union to remove the rat and cat until the target of the Union's campaign complained offers further support for the Union's contention that enforcement depends on speakers' messages. (The rat and cat were easily visible to the police, who ignored them for two days until the complaint was made.)

Finally, the Union contends that the Town has allowed other speakers 30 days to remove structures that violate the ordinance, while it insisted that the Union remove the rat and cat immediately. Yet again the district judge did not decide whether this contention is true. The Union put in the record some printed notices that the Town has used, and these notices indeed say: "All cited violations shall be corrected within 30 days after written notification". One notice has a handwritten addition changing 30 days to 48 hours, but others left the form as is. A Town employee testified that the printed notice is wrong and that there is no 30-day grace period. It may be, as the Town contends, that allowing such a delay would undermine the ordinance unduly. Still, if the Town *does* allow other speakers more time than it allowed the Union, it has engaged in content discrimination. The district court needs to make findings about the Town's actual enforcement practices—unless this controversy is moot.

We trust that, if this suit still presents a live controversy, the district judge will proceed with dispatch appropriate to the nature of the constitutional claim. We are prepared to give any appeal the same treatment.

The judgment is vacated, and the case is remanded for proceedings consistent with this opinion.

POSNER, *Circuit Judge*, concurring and dissenting. I agree that the judgment in favor of the defendant (the town) must be reversed, but I disagree that the case should be remanded. The balance of evidence is clear enough to justify our deciding that the union's constitutional right of free speech was violated.

When a case is remanded for trial, the result is almost certain to be a significant delay of the final resolution of the parties' controversy. Federal district judges have at any given time a number of cases on their docket, and so Chief Judge Griesbach, to whom this case is being remanded, is unlikely to be able to turn to it immediately. Moreover the parties' lawyers will need time, maybe a good deal of time, to get the case ready for trial. There will be time spent on pretrial motions. There will be the trial itself. After the trial and judgment may come post-judgment motions, and until those motions are ruled on the case will not be ready for an appeal. The appeal will trigger efforts by this court's settlement office to help negotiate a settlement of the case. If its efforts fail, as often is the case, the case will linger on our docket for months as the lawyers prepare their briefs. There will then be oral argument, followed, probably months—sometimes a year or more—later by a decision, which may in turn be followed by a petition for rehearing, whether by the panel, the entire court, or either. Assuming that the petition is denied (the usual ruling) and no further remand is ordered, the case will at last be at an end. But the remand ordered in the first appeal will have delayed the final decision, probably by a year and maybe by much more. (In another case heard by this panel at the same sitting in which we heard this case, there was a three-year interval between the

filing of the appeal to this court and the oral argument of the appeal.)

Delay is costly to the parties, burdens the court system by increasing the time spent by the judges on a case, and deprives the legal community for a significant period of time of the informational and precedential value of a final decision. Appellate courts should try to make the first appeal in a case the last and order a remand only when the need for further proceedings at the trial level is imperative. It was and is not in this case. Both parties had moved for summary judgment, and the judge had denied the plaintiff's (the union's) motion and granted the defendant's (the town's) and so entered final judgment for the town. The union is not asking merely that the judgment for the town be vacated; it wants us to grant summary judgment in its favor, thus terminating the litigation. We should do that.

During the litigation the construction project that inspired the union's protest was completed, but that doesn't end the parties' dispute. At the oral argument the union's lawyer told us that the union is very likely to use the rat again in a protest in Grand Chute, and the town has not suggested that a future rat protest would be treated differently. This case has been extensively briefed and argued, and the parties do not "plainly lack" an interest in the outcome, so we may decide it now. *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 192 (2000).

There is, it's true, a genuine unresolved factual dispute: it is over the town's motivation in banishing the rat. The town's enforcement of the sign ordinance that was the basis of the banishment is erratic, and the proximate cause of the rat's banishment was a complaint about the rat by an em-

ployee of the company (Kolosso Automotive) that the union was picketing. It's unlikely that the employee's complaint had anything to do with aesthetics or safety, as distinct from not wanting his employer to be publicly depicted as a rat and as a result lose face in the town and be pressured strongly by the union in any subsequent negotiations with it. But an evidentiary hearing would be required to determine the actual motivation of the employee and the town official, and thus to decide whether in banishing the rat the town had been deliberately (and improperly) taking sides in a public dispute between a union and an employer. But even without undisputed evidence of hostility to the union we should order the entry of final judgment in favor of the union.

There is no doubt that the large inflated rubber rats widely used by labor unions to dramatize their struggles with employers are forms of expression protected by the First Amendment. *Tucker v. City of Fairfield*, 398 F.3d 457, 462 (6th Cir. 2005). The rats are the traditional union picketers' signs writ large. The display of the rats is "speech" in the amplified sense in which the Supreme Court has held for example that burning the American flag to dramatize opposition to a government policy is constitutionally protected speech. *Texas v. Johnson*, 491 U.S. 397 (1989). Of course particular circumstances may justify a prohibition on otherwise protected speech—there is for example no constitutional right to burn an American flag owned by a person who refuses to consent to have it burned, or to burn it in a place in which the fire is likely to spread and cause personal injury, or property damage, to third parties.

And so the only question in this case is whether a large inflated rubber rat, placed by a union close to a busy street in

a Wisconsin town opposite the construction site of an employer with which the union is on the outs, and fastened to the ground with stakes, can cause harms the prospect or possibility of which (for there is no evidence of any *actual* harms during the five-day interval before it was ordered removed) justified the town in forbidding the rat to be placed there. (The union posted in a similar location an inflatable rubber cat, which need not be discussed separately; it presents no separate issue, though some cat fanciers will be distressed to observe that the rubber cat is shown strangling a construction worker.)

The rat was placed on a grassy field separating the northern border of Kolosso Automotive's property from a service road that runs parallel to College Avenue, a busy street parallel to the service road. As shown in the photograph below, the rat was not on or immediately adjacent to bustling College Avenue; it was roughly 70 feet from that street, with a median and service road separating it from the busy street. The rat was also located for a time on the median between College Avenue and the service road, as shown in the second photograph below, but in that location it was within the jurisdiction of the neighboring city of Appleton, not that of Grand Chute.





The district judge thought the town justified in ordering the rat's removal and granted summary judgment in the town's favor, precipitating the union's appeal to us. He noted that a town ordinance in effect at the time, Town of Grand Chute Municipal Code § 535-106(C) (2014), forbade signs on "public rights-of-way." The parties agree that a public right-of-way is the portion of a street or median set aside for public uses, such as street expansion, water mains, sewer pipes, and utilities, and that the land on which the rat

was placed is a public right-of-way. They also agree that "signs" include inflatable signs, *id.*, § 535-108(B)(15), which may display pictures as well as (or for that matter instead of) words, and therefore include the rat. The ordinance has a separate prohibition of "floating signs or other tethered inflatable signs exceeding five feet," *id.*, § 535-108(B)(16), but the town has not invoked this provision to support its banishment of the union rat.

Amended since the litigation began, the sign ordinance now makes an exception to the prohibition for inflatable signs less than five feet in length "on lots in the Community Center sign district [which includes lots zoned for certain commercial and industrial uses]. All inflatable signs must be placed a minimum of 10 feet from any property line and must be directly anchored to the ground with a tether having a maximum length of five feet. Inflatable signs require a permit and may be in use for a maximum of five days in any consecutive six-month period." *Id.*, § 535-106(F)(5) (2015). The ordinance also no longer includes a blanket prohibition of signs in public rights-of-way; instead, "no part of a sign may be located in [a] public road right-of-way unless allowed by Town Board approval based on a finding of unique circumstances or unusual hardship." *Id.*, § 535-106(D)(5) (2015). We don't know what "unique circumstances or unusual hardship" means or whether the union has sought approval for the rat under the new ordinance. But as the town has not suggested that the rat would fare better under the amended ordinance, the amendments have not rendered the case moot and so we may consider the appeal. "The heavy burden of persuading the court that the challenged conduct cannot reasonably be expected to recur lies with the party asserting mootness," and the town has not

argued that the appeal is moot. *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc., supra*, 528 U.S. at 170.

For an ordinance to be allowed to curtail a constitutional right, it must be grounded in a legitimate public concern. *Members of the City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 804–05 (1984). The town cites two such concerns: aesthetics and safety. Both are spurious as applied to the union rat. Some people may indeed think it rather handsome, in a way that one might find a dinosaur rather handsome (in fact the rat bears at least a faint resemblance to Tyrannosaurus Rex)—others that it is repulsive (those protuberant teeth!), but government cannot be allowed to suppress the visual equivalent of political speech without a more substantial aesthetic complaint; there are negative reactions even to great art. The rat is not a permanent structure, nor does it leave clutter behind that city workers must remove. *Members of the City Council of Los Angeles v. Taxpayers for Vincent, supra*, 466 U.S. at 808–10; *Tucker v. City of Fairfield, supra*, 398 F.3d at 462–63. It is present only for the duration of the protest while the union communicates its message, and it is constantly minded by union handlers. Union members are bound to enjoy it whether or not they find it aesthetically pleasing. No citizen of Grand Chute has, so far the record shows, expressed revulsion at the rat.

Of course a government museum is not required to acquire or display art that the museum's staff or the government board doesn't like, even if *hoi polloi* would. But Grand Chute is not a museum and the strip of lawn on which the union placed the rat is not an outdoor museum, a botanical garden, a state park, or any other site that might be marred

by the presence of a large inflatable rubber rat. And one must not confuse an ugly subject of art with ugly art. One of the most famous statues in the world is the Vatican's Hellenistic statue of the Trojan priest Laocoön and his two sons being killed by giant snakes, as narrated by Virgil in the *Aeneid*. It is an ugly subject, but a beautiful sculpture. The rat, with its protuberant front teeth, is an unlikely museum piece, though I imagine that some people, not only members of labor unions, would think it rather striking and impressive, or at least amusing and entertaining.

But more important, one must not confuse art with advertising. The purpose of the inflatable union rat is not to provide an aesthetic experience but to drive a better bargain with an employer. It is akin to a political poster, or to the electronic billboards in Times Square, advertising wondrous things to buy. It is not beautiful, but it is no uglier than the advertising displays in many shop windows.

The only conceivable justifications for banning the rat are to prevent congestion and (relatedly) traffic accidents; the City argues (without any evidence) that drivers on College Avenue would be distracted by the rat, resulting in congestion ("gapers' delay") and even traffic accidents. That's pure conjecture, and implausible to boot. There is no evidence of rat-caused congestion or rat-induced traffic accidents in Grand Chute (or anywhere else, for that matter). None. And that is no surprise. All sorts of what might be considered "attractive nuisances" line the streets and highways of America. Think of the enormous number and variety of billboards, some displaying pictures of scantily clad beauties. Billboards invite drivers, and not just their passengers (often there are no passengers), to glance at each billboard as they drive by.

The *entire* purpose of a billboard is to induce drivers to glance away from the road and at the billboard. Yet while billboards are often thought unsightly, especially by the fastidious, they are not seen as dangerous. And remember that the rat was not located on bustling College Avenue; it was roughly 70 feet from it and not near an intersection either. Unlike a billboard, it could not have obstructed drivers' views, and it was on display for only a couple of hours a day, after which its union minders deflated and removed it. It was never on display after dark, when driving is more dangerous than in daytime.

The presence of the union minders of the rat, who took it down every night, casts further doubt on the bona fides of the town's attempt to enforce its ordinance against the union. In confused testimony the town's code enforcer suggested that as long as a sign in a right of way is "attended, … it's viewed to be legal … as long as it meets … compliance with all the rest of our Code" as well. The rat was attended, by its minders; and to be sited where it would be visible from the town's major road was the natural location for a sign seeking to comment (albeit without words) on issues of public interest and significance, especially since the rat was in front of the construction site that was the object of the union's wrath. Of course there's the rest of the code to be considered, primarily the permit and right-of-way provisions. They might well strangle the rat display—if they were constitutional. But a restriction on speech is permissible only "to serve a significant government interest," *Frisby v. Schultz*, 487 U.S. 474, 481 (1988); *Ovadal v. City of Madison*, 416 F.3d 531, 536 (7th Cir. 2005), and the town has failed to back its alleged aesthetic and safety concerns with evidence. There is as we've noted no basis on aesthetic grounds for distinguishing between the

rat and the innumerable objects in shop windows in Grand Chute and no possible reason to limit the display of an inflatable sign to five days every six months. The absence of any governmental interest in restricting freedom of expression, we said in *Weinberg v. City of Chicago*, 310 F.3d 1029, 1038–39 (7th Cir. 2002), precludes denial of First Amendment rights. "First Amendment rights demand more than mere facial assertions. … [A] City cannot blindly invoke safety and congestion concerns." *Id*. at 1038. Especially when they are nonexistent.

I'll scandalize some readers, who think it improper for a judge to stray outside the official trial record, by sharing with them my experience with a roadside union rat. I sometimes drive to work on a major divided highway called Martin Luther King Drive, which runs north from Hyde Park, where I live, south of downtown Chicago, to downtown. As one nears the downtown on MLK Drive one sees (or rather saw, because during the long gestation of this case the rat—alas!—was removed, whether because the labor dispute between union and employer was resolved or for some other reason), on the east side of the street, a large inflated rubber rat named Drape (short for Draper and Kramer, the employer with whom the union that put up that rat was fighting). Every time I drove past the rat I glanced at it, as it was the only noteworthy sight on my route. This glance never caused me to swerve, crash, crouch in my seat, avert my eyes, hit a pedestrian, or cause other mayhem. Nor did I ever observe an accident, even a swerve, in the vicinity of the rat. I saw no driver, or pedestrian, upon glimpsing the rat flee in terror. And yet this rat, like its Grand Chute cousin, was close to a major street—in fact much closer than the Grand Chute rat was to a major street; for while the Grand Chute

rat was 70 feet from the highway, my Chicago rat was only about three feet from MLK Drive. I took a close-up photo of the rat, and another photo of it from across the street. Here are the two photos:





I can't imagine that any driver seeing Drape either close up or from across the street would have been distracted to the point of endangerment. And there is no evidence that

any driver in Grand Chute did *ever* become distracted, spaced out, muddled, confused, frightened, distrait, indignant, revolted, agitated, endangered, deluded, epileptic, or violent as a result of glimpsing an inflated rubber rat. And remember that the Grand Chute rat is much farther from the only busy road in the vicinity than Drape was from its busy road.

Conclusive evidence that Grand Chute doesn't consider the rat a safety menace is that one of the town's police officers told the union that it could display the rat provided it put it on the bed of a flatbed truck, or on a pickup truck, as long as the vehicle was kept moving rather than parked. Yet town officials had also objected to the height of the rat (estimated at 15 feet), and placing the rat on a truck would increase its height from the ground by several feet. Not only that, but surely drivers are less likely to be alarmed by a stationary rat than by one being driven alongside them—towering, doubtless swaying on its rubber legs.

If the town thought that signs were either an aesthetic outrage or a safety threat, it would doubtless try to enforce the sign-barring provisions of the ordinance. It barely tries; enforcement is sporadic. Only one person is responsible for enforcing the sign ordinance, and he is responsible for enforcing the town's other ordinances as well. The town tells us that more than 80 percent of the 627 enforcement actions for violations of the sign ordinance initiated between January 2009 and July 2014 were initiated on the basis of personal observation by the code enforcement officer, 11 percent were initiated after a citizen complained, and the rest were initiated after another town employee reported a violation. So far as appears, complaints from members of the public are rare

and their grounds have been nonexistent. These figures, moreover, represent *all* actions for violations of the sign ordinance, not just violations of the public right-of-way provision. The union presented evidence, which the town has not disputed, that many signs in public rights-of-way go unnoticed by the code enforcer, police, or other town personnel. Given the town's sporadic and arbitrary enforcement of its prohibition against signs in public rights-of-way, its claimed concern with safety and aesthetics rings hollow. That is further uncontested evidence that the ordinance serves no governmental purpose that would justify a curtailment of the union's First Amendment rights (indeed no legitimate governmental interest at all, as union busting is not such an interest).

In the unlikely event that a victory for the union would lead to a proliferation of signs on public rights-of-way, however, the town might well be justified in strictly enforcing the sign ordinance even against expressive activities normally protected by the First Amendment from government interference. Cf. *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 296–97 (1984); *Members of City Council of City of Los Angeles v. Taxpayers for Vincent*, *supra*, 466 U.S. at 807. But the town has presented no evidence that the rat stimulated other signage, or is likely to do so if allowed to return to its station by Collins Avenue.

Maybe on the remand ordered by my colleagues the town will be able to find witnesses who will testify that the rat is ugly, an eyesore, or distracts or frightens them (remember the teeth) when they glimpse it from the street. The first type of testimony will be of doubtful force given all the ugly signs and displays that Grand Chute tolerates. The sec-

ond will not be credible. In any event, the town had its chance to present evidence to that effect when it moved for summary judgment; it failed, and we should enter judgment for the union and not prolong the agony.

Lastly I note the light shed on this case by the Supreme Court's decision in *McCullen v. Coakley*, 134 S. Ct. 2518 (2014), invalidating a Massachusetts statute forbidding abortion pro-testers to approach closer than 35 feet to the entrance to an abortion clinic. The core of the opinion can be found in two brief passages, which I've strung together: "With respect to other means of communication, an individual confronted with an uncomfortable message can always turn the page, change the channel, or leave the Web site. Not so on public streets and sidewalks. There, a listener often encounters speech he might otherwise tune out. In light of the First Amendment's purpose to preserve an uninhibited market-place of ideas in which truth will ultimately prevail, this as-pect of traditional public fora is a virtue, not a vice. … Peti-tioners wish to converse with their fellow citizens about an important subject on the public streets and sidewalks—sites that have hosted discussions about the issues of the day throughout history." *Id.* at 2529, 2541 (internal quotation marks and citation omitted).

This isn't actually true. No one wants to be buttonholed on the sidewalk by bearers of "uncomfortable message[s]." And whatever the situation may have been in the eighteenth century, in the twenty-first century strangers don't meet on the sidewalk to discuss "the issues of the day." If you're as-sailed on the sidewalk by an "uncomfortable message," you don't stay to engage in a debate; you flee.

The Court went on to acknowledge "undeniably signifi-cant interests in maintaining public safety on those same streets and sidewalks, as well as in preserving access to adja-cent healthcare facilities." *Id*. at 2541. But the relevant public interest was not the maintenance of public safety. Few abor-tion protesters are violent, and police or security guards will be present to protect persons who want to enter the clinic. The issue was the privacy, anxiety, and embarrassment of the clinic's patients—interests that local government might reasonably decide outweighed the negligible contribution that abortion protesters make to the marketplace in ideas and opinions. Or so I think, but the Supreme Court doesn't agree, and I must bow.

But here is what is important about *McCullen* for the pre-sent case. Mrs. McCullen, the plaintiff, was a soft-spoken grandmother. But it took only two days after the Supreme Court's decision for the hard-core abortion protesters to ex-ploit the decision:

> For the first time in seven years, the Saturday morning antiabortion protest in front of Planned Parenthood on Commonwealth Avenue in the Back Bay pushed past the arcing yellow line that once marked protected territory: the 35-foot buffer zone. Activists chanted, prayed, and sang during a non-violent six-hour protest that occasionally erupted into vitriol and shouting.

> "Please don't kill your baby! You can celebrate a birthday next year!" protesters shouted at young women entering the clinic. They waved signs im-ploring passersby to say no to abortions, some de-picting infants nestled serenely in their mothers'

arms, another showing a bloody baby clutched by hands bearing the marks of stigmata.

At its height, the protest drew about 70 people—three times more than the average Saturday morning crowd, typically the largest gathering of the week—a turnout inspired by Thursday's US Supreme Court ruling that struck down the Massachusetts law that since 2007 had kept them outside the yellow line.

Evan Allen and Claire McNeill, "Abortion Battle Spills Across Line at Boston Clinic: Territory No Longer Protected as Buffer Zone Erased," *Boston Globe*, June 29, 2014, www.bostonglobe.com/metro/2014/06/28/protesters-gather-planned-parenthood-clinic-first-saturday-after-supreme-court-ruling-against-buffer-zone/TkOlnXO5G6HSFlfZ9XB3NK/story.html (visited August 19, 2016).

There is no doubt that with the possible exception of the shouting, the virulent protest described in the *Boston Globe* article is constitutionally protected speech by virtue of the *McCullen* decision, despite the stress that such speech must impose on women seeking to enter an abortion clinic to obtain an abortion. The giant rat in this case no doubt causes distress to the executives of the car dealership that the rat is picketing, though less distress than that of the women seeking to enter the abortion clinic through a mob of abortion protesters. Yet after *McCullen* it is clear that both forms of rude speech are protected by the First Amendment.

We should reverse, direct the district court to enter judgment in favor of the union, and be done with this case.