**United States Court of Appeals**
**Fifth Circuit**

**F I L E D**

**June 6, 2007**

**Charles R. Fulbruge III**
**Clerk**

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

))))))))))))))))))))))))))))

No. 06-30294

))))))))))))))))))))))))))))

WORLD WIDE STREET PREACHERS FELLOWSHIP; KENNETH COLEMAN, SR.

Plaintiffs-Appellants

v.

TOWN OF COLUMBIA

Defendant-Appellee

---

Appeal from the United States District Court
for the Western District of Louisiana
No. 3:05-CV-0513

---

Before KING, GARZA and PRADO, Circuit Judges.

PER CURIAM:[*]

Plaintiff-Appellant World Wide Street Preachers Fellowship ("SPF") and one of its members Plaintiff-Appellant Kenneth Coleman ("Coleman") (collectively, "Plaintiffs") have chosen in recent years to demonstrate alongside various roads in Defendant-Appellee Town of Columbia ("Columbia"). Following several encounters with Columbia police officers, one SPF member was

---

[*] Pursuant to 5TH CIRCUIT RULE 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIRCUIT RULE 47.5.4.

arrested and other demonstrators were threatened with arrest. This lawsuit followed. On cross-motions for summary judgment, the district court held that Plaintiffs' First Amendment rights had not been violated by Columbia's actions and that Plaintiffs were not entitled to attorneys' fees. Plaintiffs appealed the adverse decision, and we now REVERSE the district court's grant of Columbia's motion for summary judgment, AFFIRM the district court's denial of Plaintiffs' motion for summary judgment, and REMAND for further proceedings consistent with this opinion.

## I. FACTUAL AND PROCEDURAL BACKGROUND

SPF is an organization of street preachers. In recent years, SPF has demonstrated several times in Columbia, Louisiana. As shown by the DVDs of their activities in Columbia, SPF's demonstrations consist of members standing on the side of a road holding up signs with one or two members speaking into bullhorns.[1] Many of the signs speak of the consequences of sin and the need for repentance. Some, however, are critical of abortion, homosexuals, and women pastors. Of significance to this case, some of SPF's anti-abortion signs contain pictures of aborted babies. These demonstrations appear to be attended by anywhere from five to fifteen SPF members.

Plaintiffs carried out one such demonstration on December 27, 2003, at the southwest corner of the intersection of Highway

---

[1] SPF recorded portions of their demonstrations in Columbia and have entered the DVDs of those demonstrations into evidence.

165 and Church Street in Columbia. Plaintiffs called the police when one of the demonstrators was almost hit by a car. Officer Robert Miles ("Miles"), the Assistant Police Chief, spoke with SPF member Allen Russell ("Russell") about the situation. During their conversation, Miles made the following statements:[2]

- We don't mind you all holding up the signs but do you have to hold up those . . . pictures?

- If it's offensive to one person, that makes it wrong.

- It's just like disturbing the peace.

- It's not the fact that you're out here. It's the fact that your signs are offensive.

Miles, however, indicated that he agreed with Plaintiffs' anti-abortion message. He also repeatedly asked that the SPF members remain behind the white fog line on the edge of the highway.[3] Plaintiffs continued with their demonstration and were not required to put away their signs.

Several SPF members returned to the same location on December 30, 2003, although it is unclear whether Coleman was with them. Columbia Chief of Police Doug Crockett requested that the SPF members put away their signs until he could determine

---

[2] Plaintiffs assert the statements were made by Miles, as opposed to another officer at the scene; however, the DVD does not reflect which officer made the statements. Columbia has not contested that the statements were made by Miles on appeal.

[3] The evidence does not indicate whether Plaintiffs had actually crossed over the white line or whether Miles was simply asking them to be cautious.

3

whether their actions violated the law. The SPF members refused, and they were permitted to proceed with their demonstration.

When the southwest corner of the intersection of Highway 165 and Church Street underwent excavation, Plaintiffs moved their demonstrations to the southeast corner. A United Methodist Church ("United Methodist") is located on and owns the land in this corner of the intersection. In this area, Highway 165 is bordered by a white fog line, followed by a paved shoulder, and then an area of dirt and grass. The district court found, and it has not been contested on appeal, that the area of dirt and grass is United Methodist's property, while the highway and paved shoulder are the property of Louisiana. What is contested on appeal is the width of the paved shoulder--Plaintiffs contend it is eight feet wide, but the district court stated it is only two feet wide.

A sidewalk runs along Church Street in front of United Methodist. Plaintiffs demonstrated on this sidewalk on May 15, 2004. One United Methodist parishioner became so enraged by Plaintiffs' speech that she started a minor physical altercation with an SPF member. The police became involved, but there is no evidence that anyone was ever charged with any sort of crime in connection with the incident.

Things came to a head on February 12, 2005, when Plaintiffs were demonstrating along Highway 165 in the southeast corner of the intersection with Church Street. State Trooper John Wiles

4

("Wiles") passed by and contacted the Columbia police department. He said that he witnessed several SPF members either standing on the white fog line or on the highway itself and asked that the Columbia police move the demonstrators back from the road. The police department had also previously received complaints from United Methodist about Plaintiffs standing on its property.

Several Columbia police officers, including Miles, responded. The DVD of the events that followed is only a few minutes long and begins after the police officers arrived at the scene. There appear to have been fewer than ten demonstrators that day, but one was holding a sign depicting an aborted baby. Some demonstrators were standing on United Methodist's property, although it is unclear if they had been standing there the entire time or had moved there after three police cars parked on the shoulder.

Miles told the demonstrators that they had five minutes to get off the property and leave. When Russell began to argue with him, Miles stated, "This is the church property. They don't want you here. And this is state's property. They don't want you here." He also stated, "You are disrupting everybody." When Russell continued to argue that they had a right to be on public property, Miles arrested him. It appears Russell may have been standing on the shoulder at that time, but the DVD evidence is not conclusive. While arresting Russell, Miles turned to the remaining demonstrators and asked "All of y'all want to go, too?"

Miles further told the demonstrators that "[y]ou cannot picket, boycott on State property or right-of-way" and to "[p]ut that sign away and y'all get off this parking lot or I will arrest every one of you." The demonstrators then left.

Miles's affidavit of probable cause for Russell's arrest states that Miles "approached the group and advised them that they were causing a disturbance with their actions, and pictures and that [sic] were on the state right of way, and that they needed to leave the area . . . The group didn't have any permit to be on the right of way, and they were to [sic] close to the flashing red beacon (red light) . . . ." Russell was charged with resisting an officer (LA. REV. STAT. ANN. § 14:108, the "Resisting statute"), stopping or standing in specified areas (LA. REV. STAT. ANN. § 32:143, the "Standing statute"), and demonstrating without a permit (LA. REV. STAT. ANN. § 14:326, the "Permit statute"). No mention is made of what happened to these charges, but Russell spent two days in jail as a result.

Plaintiffs' attorneys wrote several letters to Columbia officials arguing that the police officers' actions violated Plaintiffs' First Amendment rights. They asked for an apology, damages, attorneys' fees, and a guarantee that Columbia would let Plaintiffs peacefully demonstrate in the future. Columbia's attorneys responded that Plaintiffs had peacefully demonstrated before and were welcome to return and demonstrate in accordance with reasonable time, place, and manner restrictions. Columbia

6

noted that, on February 12, 2005, SPF members were on private property, in a construction zone, and within twenty feet of a traffic light. Columbia further asserted that a demonstration at that same location would require a permit pursuant to Louisiana law.

Dissatisfied with this response, Plaintiffs filed suit in federal court against Columbia on March 22, 2005, bringing claims under 42 U.S.C. § 1983. Plaintiffs asserted that Columbia's actions violated their First Amendment rights to free exercise of religion, free speech, and free assembly. They sought nominal damages, declaratory relief that the application of the Resisting, Standing, and Permit statutes was unconstitutional, injunctive relief that would enable them to continue demonstrating, and attorneys' fees under 42 U.S.C. § 1988. On March 23, 2005, the district court entered a Temporary Restraining Order, prohibiting Columbia from interfering with Plaintiffs' First Amendment rights and setting a preliminary injunction hearing for April 1, 2005.

On May 5, 2005, the district court entered a preliminary injunction that the three statutes under which Russell was arrested did not apply to SPF's activities. However, the district court found that two other statutes (LA. REV. STAT. ANN. §§ 14:97 & 48:21) could possibly apply to Plaintiffs' conduct. Section 14:97 prohibits obstructing a highway of commerce, and section 48:21 defines the functions of the Louisiana Department

of Transportation and Development to include maintaining the public highways. The district court found that these two statutes prevented Plaintiffs from establishing an unfettered right to demonstrate on the corner of their choosing. Therefore, while the district court enjoined Columbia from enforcing the three inapplicable statutes against Plaintiffs and from unconstitutionally interfering with Plaintiffs' First Amendment rights, the district court determined that Plaintiffs had not met their burden of demonstrating a likelihood of success on the merits of their First Amendment claim, because their conduct could be regulated by sections 14:97 and 48:21.

On May 21, 2005, Coleman and Russell, along with others, preached and held signs on the sidewalk along Highway 165 near the intersection of Pearl Street. The police told them that they could not protest within twenty-five feet of the intersection, nor could they stand in the blocked-off portion of the intersection, despite the fact that other pedestrians used those areas.[4] According to Columbia, the police were simply trying to move the protesters back a "mere few feet" due to unusually heavy traffic that day as a result of a local festival. Plaintiffs assert they were ordered to move forty feet away. When the SPF members refused to move, Coleman was arrested for violating the

_____

[4] The DVD shows that Pearl Street had been closed down on one side to facilitate Columbia's Riverboat Festival, permitting pedestrians to walk down Pearl Street without interrupting traffic.

8

Resisting Statute by "congregation with others on a public street and refusal to move on when ordered by the officer." See LA. REV. STAT. ANN. § 14:108. Russell was arrested for assaulting a police officer when he was forcefully removed from standing near the intersection. There is no mention made of what happened to these charges; however, in their briefing before this court, Plaintiffs assert that the May 21 event is not part of the instant lawsuit. We include mention of it here because the district court relied on the events of May 21 in its summary judgment order.

On January 25, 2006, the district court entered its order on the parties' cross-motions for summary judgment. The district court determined, after reviewing the DVD of the May 21, 2005 demonstration, that the officers' actions were taken only to move the Plaintiffs back from the highway for safety reasons and were not motivated by Plaintiffs' speech. The district court held that the officers were permitted to take these actions based on sections 14:97 and 48:21, the two statutes the district court found applicable in its preliminary injunction ruling. Therefore, the district court concluded that Plaintiffs had not established a First Amendment violation. Consequently, the district court dismissed Plaintiffs' case and dissolved the preliminary injunction. The district court also ruled that Plaintiffs' partial victory with respect to the preliminary injunction did not entitle them to attorneys' fees pursuant to 42

9

U.S.C. § 1988.  Plaintiffs have appealed.

## II. JURISDICTION

We have jurisdiction over this appeal pursuant to 28 U.S.C. § 1291, because Plaintiffs are appealing the final judgment of the district court.  See Morris v. Equifax Info. Servs., L.L.C., 457 F.3d 460, 464 (5th Cir. 2006) (acknowledging appellate jurisdiction under § 1291 to review grant of summary judgment).

## III. STANDARD OF REVIEW

We review a district court's order granting summary judgment de novo.  Id.  Summary judgment is appropriate when, after considering the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c); Bulko v. Morgan Stanley DW, Inc., 450 F.3d 622, 624 (5th Cir. 2006).  A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the non-movant.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  In considering a summary judgment motion, all inferences drawn from the underlying facts must be viewed in the light most favorable to the non-movant.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## IV.  DISCUSSION

On appeal, Plaintiffs assert that the evidence shows that

10

Columbia engaged in content-based discrimination against them when its police officers threatened Plaintiffs with arrest on February 12, 2005. Plaintiffs argue that the district court erred by not applying the correct standard to their First Amendment claims and in failing to even reach the constitutional issues. Columbia counters that there is no evidence of content-based discrimination and that its officers' actions were appropriate.

Before we begin our analysis, we first make clear the conduct at issue in this case. Because Plaintiffs state in their briefing that the May 21, 2005, events are not part of this lawsuit, we concern ourselves only with the events on February 12, 2005. On that day, the evidence, taken in the light most favorable to Plaintiffs, shows that Plaintiffs' First Amendment rights were restricted when Columbia's police officers threatened to arrest Plaintiffs if they did not leave the demonstration.[5] "The threat of sanctions may deter [the exercise of First

---

[5] We do not consider Russell's arrest to be a First Amendment injury to Plaintiffs, because SPF, as an organization, lacks standing to seek relief for injuries to a single member. See Self-Ins. Inst. of Am., Inc. v. Korioth, 53 F.3d 694, 695-96 (5th Cir. 1995) ("Though an association may have standing to seek 'a declaration, injunction, or some other form of prospective relief' on behalf of its members, it does not enjoy standing to seek damages for monetary injuries peculiar to individual members where the fact and extent of injury will require individualized proof."); O'Hair v. White, 675 F.2d 680, 692 (5th Cir. 1982) (en banc) (finding organization lacked standing to pursue one member's due process and equal protection claims or member's request for an injunction specific to her).

Amendment rights] almost as potently as the actual application of sanctions." NAACP v. Button, 371 U.S. 415, 433 (1963); see also Aebisher v. Ryan, 622 F.2d 651, 655 (2d Cir. 1980) ("Where the use of coercive power is threatened, First Amendment rights may be violated by the chilling effect of governmental action that falls short of a direct prohibition against speech."). Further, Columbia does not dispute that Plaintiffs were exercising their free speech, religion, and assembly rights by demonstrating that day. Plaintiffs have, thus, created a fact issue that their First Amendment rights were restricted on February 12, 2005. Therefore, we must now determine whether such a restriction was in violation of the First Amendment by considering the constitutional standards under which we measure Columbia's conduct.

A.    First Amendment Standards

Plaintiffs have brought claims of free speech, free exercise of religion, and free assembly.  Although not identical, the constitutional standards for speech, religion, and assembly are similar.  Turning first to freedom of speech, we note that the Supreme Court has set forth two separate tests to determine whether a governmental restriction on speech violates the First Amendment--strict scrutiny and intermediate scrutiny.  The key to deciding which test to apply to the government's conduct is whether the restriction was content-based, in which case the strict scrutiny test applies, or content-neutral, in which case we apply intermediate scrutiny.

Strict scrutiny, as applied to content-based restrictions of speech, requires the government to show that the restriction at issue is narrowly tailored to promote a compelling governmental interest.  United States v. Playboy Entm't Group, Inc., 529 U.S. 803, 813 (2000).  If a less restrictive alternative is available, the governmental restriction cannot survive strict scrutiny.  See id.  Intermediate scrutiny, on the other hand, requires the government to demonstrate that: (1) the restriction is within the constitutional power of the government; (2) the restriction furthers an important or substantial governmental interest; (3) the governmental interest is unrelated to the suppression of free expression; and (4) the incidental restriction on First Amendment freedoms is no greater than is essential to the furtherance of

13

that interest.  <u>United States v. O'Brien</u>, 391 U.S. 367, 377 (1968); <u>Horton v. City of Houston</u>, 179 F.3d 188, 194 (5th Cir. 1999).  Courts often shorten this inquiry into whether the restriction is narrowly tailored to serve a significant government interest and leaves open alternative channels of communication.  See <u>Horton</u>, 179 F.3d at 194.  In the context of intermediate scrutiny, "narrowly tailored" does not require that the least restrictive means be used.  <u>Ward v. Rock Against Racism</u>, 491 U.S. 781, 798 (1989).  Rather, so long as the restriction promotes a substantial governmental interest that would be achieved less effectively without the restriction, it is sufficiently narrowly tailored.  <u>Id.</u> at 799.

The principal inquiry in determining whether a restriction is content-based or content-neutral, and thus whether strict or intermediate scrutiny should be applied, is whether the government has adopted the restriction of speech because of the government's disagreement with the message conveyed.  <u>Id.</u> at 791. "A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." <u>Id.</u> (holding a regulation is content-neutral as long as it is justified without reference to the content of the regulated speech).  Consequently, in order to determine which test should be applied to Columbia's restriction of Plaintiffs' speech--strict scrutiny or

14

intermediate scrutiny--we must decide whether Columbia's restriction was based on the content of Plaintiffs' speech or rather was content-neutral.

The constitutional tests for whether governmental action unconstitutionally infringes on the free exercise of religion and freedom of assembly are similarly dependent on whether the restriction was motivated by the nature of the conduct that is restricted.  With respect to the free exercise of religion, if the object of a law is to infringe upon or restrict practices because of their religious motivation, the law is invalid unless it is justified by a compelling interest and is narrowly tailored to advance that interest.  Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 533 (1993).  In other words, a restriction of religious practices because of their religious nature must survive strict scrutiny.  See id. at 546.  However, a law that is neutral and of general applicability need not be justified by a compelling governmental interest, even if that law has the incidental effect of burdening a particular religious practice.  Id. at 531.  Thus, the motivation for the restriction on the exercise of religion must be established before the restriction can be legally analyzed.[6]

Likewise, the Supreme Court has held that an infringement on

_____

[6]  Although the free exercise test is typically framed in terms of analyzing a "law," its analysis can be applied to Columbia's actions as a governmental authority.

15

the right to associate for expressive purposes can be justified by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms.  Roberts v. U.S. Jaycees, 468 U.S. 609, 623 (1984); see also La. Debating & Literary Ass'n v. City of New Orleans, 42 F.3d 1483, 1498 (5th Cir. 1995) (applying strict scrutiny to restriction on associational freedoms).  Therefore, the restriction on freedom of assembly must also be unrelated to the purpose of the assembly.

Given the above tests for violations of the First Amendment rights of free speech, free exercise of religion, and free assembly, it is clear that the motivation for the restriction at issue is key to determining which constitutional standard should be applied.  For purposes of this opinion, we will use the terms "content-based" and "content-neutral" to describe the possible motivations of Columbia's officers, although the tests for free exercise of religion and free assembly do not generally use those terms.  Once we determine whether the restriction was content-based or content-neutral, we will know which constitutional standards to apply to Columbia's conduct.  We now consider the reasons set out by Columbia to explain its officers' actions and whether Plaintiffs have created a genuine issue of material fact that those were Columbia's true reasons for restricting

16

Plaintiffs' rights.[7]

B.    Whether Columbia's Actions Were Content-Based or Content-Neutral

Numerous content-neutral reasons have been put forward by Columbia to justify its police officers' actions on February 12, 2005.  Russell was arrested for violating the Resisting, Standing, and Permit statutes, so those statutes could provide a reason to threaten Plaintiffs with arrest.  During litigation, Columbia argued that sections 14:97 and 48:21 of the Louisiana Revised Statutes provided a justification for its actions.  Trespassing and general safety concerns have also been alleged.  If the evidence shows that these content-neutral reasons were Columbia's actual reasons, then we may apply intermediate scrutiny.  If, however, Plaintiffs have created a genuine issue of material fact as to whether these asserted reasons were Columbia's actual reasons or whether Columbia acted because of the content of Plaintiffs' demonstration, we must reverse and remand for a determination of Columbia's true motivations.  Only then will it be clear whether strict scrutiny or a lesser form of

_____

[7]    We note that municipal liability under 42 U.S.C. § 1983 must be premised on the policy or custom of the municipality or the act of a policymaker.  See Pembaur v. City of Cincinnati, 475 U.S. 469, 480-81 (1986); Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978).  The parties have not raised or briefed this issue; therefore, our focus in this case is on the actions of the officers, which is what the parties have argued.  But see Collins v. City of Harker Heights, 503 U.S. 115, 123 (1992) (stating that a municipality is not subject to liability under § 1983 by way of respondeat superior).

17

scrutiny applies.

### 1.  Resisting, Standing, and Permit Statutes

We turn first to the three statutes--Resisting, Standing, and Permit--that the district court determined were inapplicable to Plaintiffs' conduct.  Columbia has not contested on appeal the district court's conclusion that the statutes were inapplicable; however, we emphasize the fact that, as shown below, even taking the officers' allegations as true, Plaintiffs' conduct could not have violated the statutes.

Section 14:108, the Resisting statute, provides that it is an offense to intentionally interfere with an officer making a lawful arrest, seizing property, or serving process.  Louisiana courts have limited the reach of this statute to interference with those actions alone.  State v. Huguet, 369 So. 2d 1331, 1333 (La. 1979); State v. Joseph, 759 So. 2d 136, 140 (La. Ct. App. 2000); State v. Green, 706 So. 2d 536, 539 (La. Ct. App. 1997).  Because Plaintiffs were not interfering with an arrest, seizure of property, or service of process, the Resisting statute could not have been applied to their actions.[8]

The Standing statute, section 32:143, states that "[n]o person shall stand, or park a vehicle" within fifteen feet of a fire hydrant, within twenty feet of a crosswalk, or within twenty

---

[8]  Although the police officers did arrest Russell, the DVD does not reflect, and Columbia does not contend, that Plaintiffs interfered with that arrest in any way.

18

feet upon the approach to any stop light.  Although Plaintiffs were "standing" within these areas, "stand" is defined in section 32:1(71) as temporarily halting a *vehicle*.  Therefore, the statute is inapplicable to human beings, such as SPF members, who are standing in these areas.

Finally, the Permit statute, section 14:326, requires groups to obtain a permit before staging a parade, march, or demonstration.  However, the statute only applies to parishes with populations of at least 450,000.  LA. REV. STAT. ANN. § 14:326(C).  Caldwell Parish, in which Columbia is located, clearly did not meet this population threshold; therefore, Plaintiffs were not required to obtain a permit before demonstrating in Columbia.

As a result, Plaintiffs' conduct, as alleged by Columbia's police officers, would not have resulted in the violation of any of these statutes.  Consequently, there is a genuine issue of material fact as to whether the officers were motivated to restrict Plaintiffs' First Amendment rights on the basis of these statutes.  By this we are not saying that there is a fact issue regarding the First Amendment anytime an individual's rights are restricted by application of a content-neutral statute and the individual is subsequently determined to be not guilty of violating that statute.  Nor are we holding that it is appropriate to assume the officers were motivated by the content

19

of Plaintiffs' demonstration just because Plaintiffs were not in violation of the statutes. Rather, we are simply stating that the absence of any allegations by the officers that would have supported a finding that Plaintiffs were violating the Resisting, Standing, and Permit statutes creates a genuine issue of material fact as to whether the officers were actually motivated to restrict Plaintiffs' demonstration on the basis of those statutes.

### 2. Sections 14:97 and 48:21

Columbia was able to successfully defend its actions on February 12, 2005, to the district court on the basis of sections 14:97 and 48:21 of the Louisiana Revised Statutes. Section 14:97 makes simple obstruction of a highway punishable by a fine, imprisonment, or both. Simple obstruction is defined as "the intentional or criminally negligent placing of anything or performance of any act on any railway, railroad, navigable waterway, highway, thoroughfare, or runway of an airport, which will render movement thereon more difficult." Section 48:21 states that the functions of the Louisiana Department of Transportation and Development are "to study, administer, construct, improve, maintain, repair, and regulate" the roads in Louisiana.

We make no determination whether Plaintiffs violated either of these two statutes or whether the district court correctly

interpreted them.  We do, however, hold that there is no evidence that these statutes provided the basis for Columbia's actions on February 12, 2005.  In its order on the cross-motions for summary judgment, the district court recognized that these statutes were "not relied upon to remove" Plaintiffs.  (01/25/06 Dist. Ct. Ruling at 8).  Instead, these statutes were first advanced by Columbia after litigation commenced.  The district court erred in using these statutes to create a content-neutral justification for Columbia's actions on February 12, 2005, without any evidence that Columbia's police officers actually relied on those statutes on that day.  Therefore, Columbia's motivation for restricting Plaintiffs' First Amendment rights remains a genuine issue of material fact.

### 3.  Trespassing

Columbia also asserts that Plaintiffs were trespassing on February 12, 2005.  Miles did state on the DVD that Plaintiffs were not welcome on either United Methodist's property or the state's property, indicating that he believed Plaintiffs were trespassing.  To the extent Plaintiffs were standing on United Methodist's property, Plaintiffs do not contest that they could be removed for trespassing.  See LA. REV. STAT. ANN. § 14:63.  The same does not hold true for the paved shoulder, however.  Columbia points to no law that makes it a trespass to stand on state property next to a highway.  In its opinion on Plaintiffs'

21

preliminary injunction motion, the district court determined that the paved portion of Highway 165 was "'the archetype of a traditional public forum.'" (05/05/05 Dist. Ct. Op. at 9) (citing Frisby v. Schultz, 487 U.S. 474, 480 (1988)). Restrictions on demonstrations on the paved shoulder are thus subject to analysis under the strict or intermediate scrutiny standards, depending on whether the restriction was content-based or content-neutral. See Frisby, 487 U.S. at 481.[9] Therefore, whether Columbia's restrictions on Plaintiffs' demonstration were content-based or content-neutral is still a fact question.

### 4. General Safety Concerns

The district court stated in its order below that, after reviewing the DVD of the May 21, 2005, incident, "the Court concludes that the officers were not prohibiting the [SPF members'] demonstration, but again, merely trying to move the [SPF members] away from the intersection for the safety of drivers as well as the [SPF members]." (01/25/06 Dist. Ct. Ruling at 9). This conclusion was erroneous for several reasons.

First, the motivations for the officers' actions on May 21, 2005, say little, if anything, about the officers' motivations on

---

[9] Although not necessary to our decision, we note that the DVD of the February 12, 2005, incident shows police cars parked on the paved shoulder of Highway 165. As the cars were more than two feet wide, this evidence appears to conflict with the district court's finding that the paved shoulder is only two feet wide. The DVD suggests that the width of the paved shoulder might vary, but it is, at the very least, a fact issue.

22

February 12, 2005.  Indeed, it is not clear that the same officers were involved in each incident.

Second, the DVD is far from conclusive evidence that the officers were only concerned about the safety of drivers and Plaintiffs on May 21.  The DVD shows that the officers claimed to be relying on state law when they required Plaintiffs to stand over twenty-five feet from the intersection of Highway 165 and Pearl Street.  However, the district court had already ruled that the Standing statute, section 32:143, did not apply to Plaintiffs' conduct and had preliminarily enjoined Columbia from enforcing the statute against Plaintiffs.  Columbia has offered no other justification for the twenty-five foot rule.  Further, Coleman was arrested for violating section 14:108, the Resisting statute, but, again, there is no evidence on the DVD that he interfered with an officer making an arrest, seizing property, or serving process.  See Huguet, 369 So. 2d at 1333.  The district court had also enjoined the use of that statute against Plaintiffs.  Finally, it is a fact question whether the traffic conditions were hazardous enough to require Plaintiffs to refrain from standing near the intersection.  Indeed, other pedestrians were permitted to walk through the areas in which Plaintiffs wished to stand.  Therefore, the police officers' motivations on May 21, 2005, are far from clear.

Columbia tries to analogize its case to one considered by the Eighth Circuit in Frye v. Kansas City Missouri Police

Department, 375 F.3d 785 (8th Cir. 2004). In Frye, the plaintiffs demonstrated against abortion by standing on the side of a road holding signs, some of which contained pictures of mutilated fetuses. Id. at 788. Following complaints from drivers, the police gave the plaintiffs the choice of either relocating to a different portion of the road or taking down the graphic signs. Id. Several demonstrators were arrested under the loitering ordinance when they refused to obey. Id. The Eighth Circuit found no First Amendment violation. The court stated that the officers' actions were not motivated by the content of the signs, but rather out of a concern for public safety. Id. at 790 (holding that the plaintiffs' message was not suppressed, but only regulated as to time, place, and manner).

The facts in the instant lawsuit are distinguishable from those in Frye. First, it is unclear how the Eighth Circuit arrived at the conclusion that the officers' actions were not motivated by the content of the signs; therefore, the evidence may be markedly different. Second, the officers in Frye did not completely stop the demonstration, but permitted it to continue in a different place or with different signs.[10] Here, there is no evidence that on February 12, 2005, Columbia gave Plaintiffs any option other than to stop the demonstration entirely. If

_____

[10] We do not necessarily hold that the approach taken by the officers in Frye would be acceptable in this case. Each case must be decided on its own facts.

24

this is the case, it is questionable whether the cessation of the demonstration altogether was narrowly tailored.

The Seventh Circuit encountered a similar situation in Ovadal v. City of Madison, 416 F.3d 531 (7th Cir. 2005). In Ovadal, the plaintiff, Ralph Ovadal, demonstrated against homosexuality by holding up signs on pedestrian overpasses. Id. at 533-34. Responding to complaints by drivers that the signs were causing traffic problems, police officers eventually told Ovadal that he was no longer allowed to display his signs on pedestrian overpasses, citing the disorderly conduct statute. Id. at 534. The Seventh Circuit determined there was a genuine issue of material fact as to whether Ovadal's First Amendment rights had been violated. Id. at 537-38. The court found fact issues as to whether the ban on Ovadal's actions was content-neutral, whether it was narrowly tailored, whether the city would have banned all demonstrations on pedestrian overpasses regardless of content, whether a rule that banned demonstrators if their signs caused traffic problems could even be applied in a content-neutral manner, and whether the ban was really just aimed at Ovadal. Id.[11]

---

[11] On remand, the district court in Ovadal held a bench trial and found that the restriction was content-neutral and satisfied strict scrutiny. Ovadal v. City of Madison, No. 04-C-322-S, 2005 WL 3434402, at *1 (W.D. Wis. Dec. 13, 2005). The Seventh Circuit affirmed the decision, Ovadal v. City of Madison, 469 F.3d 625, 631 (7th Cir. 2006), and Ovadal has filed a petition for certiorari with the Supreme Court.

Ovadal is similar to the instant case in that there is simply too much uncertainty about the motivations of the governmental action to determine whether a First Amendment violation took place.  Here, as discussed above, the reason for the police officers' actions on February 12, 2005, is a fact question.  Further, Miles, the officer who threatened Plaintiffs with arrest, had previously made comments indicating he did not approve of Plaintiffs' graphic signs.  When combined with the lack of undisputed evidence as to why Plaintiffs' First Amendment rights were restricted, there is a fact issue regarding whether the officers were actually motivated by the content of Plaintiffs' demonstration, which prevents summary judgment on the issue of whether the restriction was content-based or content-neutral.  Without knowing the motivation for the restriction, we cannot determine which test to apply--strict scrutiny or a lesser level of scrutiny.  Summary judgment on this issue was, thus, inappropriate, and we must reverse the district court's decision to grant Columbia's motion for summary judgment; however, we will affirm the district court's decision to deny Plaintiffs' motion for summary judgment, as there are fact issues in this case.

C.   Other Relief

Finally, Plaintiffs requested, and were denied, declaratory relief, injunctive relief, and attorneys' fees. To the extent Plaintiffs seek a declaration that their First Amendment rights were violated by Columbia's restriction of their demonstration on February 12, 2005, we must reverse for the above-stated reasons. If Plaintiffs are seeking a declaration that they may demonstrate in Columbia in the future and injunctive relief to that effect, we also reverse so that the district court may make this ruling after determining whether Plaintiffs' First Amendment rights are actually being infringed.

As for attorneys' fees, 42 U.S.C. § 1988 provides that courts, in their discretion, may award attorneys' fees to prevailing parties in § 1983 cases. Because the prevailing party is yet unknown in this case, we also reverse the district court's ruling on attorneys' fees.

## V. CONCLUSION

For the foregoing reasons, we REVERSE the order of the district court to the extent it granted Columbia's motion for summary judgment, AFFIRM the order to the extent it denied Plaintiffs' motion for summary judgment, and REMAND for further proceedings consistent with this opinion.

REVERSED in part, AFFIRMED in part, and REMANDED.