**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CENTER FOR BIO-ETHICAL REFORM,
INC.; PAUL KULAS; THOMAS
PADBERG,

          *Plaintiffs-Appellants,*

         v.

LOS ANGELES COUNTY SHERIFF
DEPARTMENT; LEROY D. BACA, in
his official capacity as Sheriff;
XAVIER R. AGUILAR, individually;
XAVIER R. AGUILAR, in his official
capacity as Sergeant; DAVE
DESPOT, individually; DAVE
DESPOT, in his official capacity as
Deputy; MARK DARLING,
individually; MARK DARLING, in his
official capacity as Deputy; MARK
C. REPCIK, individually; MARK C.
REPCIK, in his official capacity as
Deputy; ART ROBERTS,
individually; ART ROBERTS, in his
official capacity as an
administrative official, Dodson
Middle School,

          *Defendants-Appellees.*

No. 05-55294

D.C. No.
CV-03-00386-GLT

OPINION

Appeal from the United States District Court
for the Central District of California
Gary L. Taylor, District Judge, Presiding

Argued and Submitted
February 12, 2007—Pasadena, California

7983

Filed July 2, 2008

Before: Harry Pregerson, William A. Fletcher, and
Marsha S. Berzon, Circuit Judges.

Opinion by Judge Pregerson

**COUNSEL**

Robert J. Muise (argued), Thomas More Law Center, Ann Arbor, Michigan; James A. Hayes, Cummins & White LLP, Newport Beach, California, for the plaintiffs-appellants.

Jennifer A.D. Lehman (argued), Deputy County Counsel, Raymond G. Fortner, County Counsel, Los Angeles, California, for defendants-appellees Los Angeles County Sheriff's Department.

Julie Mullane (argued), Gary Robert Gibeaut, Nancy Mahan-Lamb, Lisa J. Brown, Gibeaut, Mahan & Briscoe, Los Angeles, California, for defendant-appellee Art Roberts.

---

**OPINION**

PREGERSON, Circuit Judge:

Plaintiffs drove a truck that displayed enlarged, graphic photographs of early-term aborted fetuses around the perimeter of a public middle school in Rancho Palos Verdes, California. Deputy Sheriffs were dispatched to the school. Plaintiffs contend that the officers violated their First Amendment rights by ordering Plaintiffs to remove their truck from an area adjacent to the school. Plaintiffs also contend that the officers violated their Fourth Amendment rights by detaining Plaintiffs for an unreasonable time and by searching their vehicle without consent.

Plaintiffs brought this action under 42 U.S.C. § 1983 seeking damages and injunctive and declaratory relief for violation of their First and Fourth Amendment rights. The district court held that the Deputy Sheriffs and Dodson Middle School Assistant Principal Art Roberts were entitled to qualified immunity and dismissed the damages claims against them. In

addition, the court dismissed the lawsuit against Los Angeles County Sheriff Leroy D. Baca, a redundant defendant. After considering cross-motions for summary judgment, the district court granted summary judgment in favor of Defendants on the remaining First and Fourth Amendment claims. Plaintiffs timely appealed these orders.

We have jurisdiction under 28 U.S.C. § 1291. For the reasons set forth below, we reverse the district court's orders (1) granting Defendants' summary judgment motion on all the issues in the case, and (2) denying Plaintiffs' summary judgment motion with respect to Plaintiffs' First Amendment claim and Fourth Amendment Claim for unreasonable detention. We affirm the district court's order (1) dismissing Sheriff Leroy D. Baca and (2) granting qualified immunity to the individual defendants on the First Amendment claim. We remand for the district court to resolve Plaintiffs' conspiracy claim and request for injunctive relief.

## I.  BACKGROUND

### A.  Facts

Plaintiff Center for Bio-Ethical Reform (Bio-Ethical Reform) is a non-profit organization whose main purpose is to promote "prenatal justice and the right to life for the unborn, the disabled, the infirm, the aged, and all vulnerable peoples through education and the development of innovative educational programs." One of the educational programs is called the "Reproductive Choice Campaign." With this campaign, Bio-Ethical Reform seeks to "expose as many people as possible to the reality of abortion" by displaying large, graphic photographs of first-term aborted fetuses on the sides of trucks. The trucks often drive on surface streets and freeways, but Bio-Ethical Reform employees and volunteers sometimes take the trucks to specified places to target particular audiences.

Middle school and high school students are a common target audience. Bio-Ethical Reform conducts its campaign at such schools because it believes its message will discourage teenage abortions. Bio-Ethical Reform also believes that "students who are old enough to have an abortion are old enough to see one." Bio-Ethical Reform personnel arrive at the start of the academic day so that students will see Bio-Ethical Reforms's enlarged photographic images of first-term aborted fetuses as they arrive for school.

Gregg Cunningham, Bio-Ethical Reform's Executive Director, acknowledged in his deposition that he has seen students "faint," "become physically ill," "weep," "avert their gaze," and "leave the room" in response to these pictures. Cunningham said that the "typical" reaction is disbelief. He defended Bio-Ethical Reform's display of aborted fetuses, saying that "[s]tudents are routinely exposed to disturbing images, whether it's airlines exploding into skyscrapers or choose your atrocity." Cunningham also asserted that exposing children to such pictures is the best way to teach them about the ethical issues involving abortion: "you can't teach inexpressively horrific historical fact in exclusive reliance on the written or spoken word. Teachers who teach about racial injustice use pictures of black people being beaten to their knees for trying to register to vote."

On March 24, 2003, Plaintiffs Paul Kulas, a Bio-Ethical Reform employee, and Thomas Padberg, a Bio-Ethical Reform volunteer, drove to Dodson Middle School in Rancho Palos Verdes, California. Kulas drove a truck that displayed the photographic images of aborted fetuses and Padberg drove an escort "security vehicle." The security vehicle was a white Ford Crown Victoria sedan equipped with a security cage, red-and-amber flashing lights, push bars, and antennae mounted on the roof. The two men arrived at the school at about 7:30 a.m. — about thirty minutes before classes began. They then drove on public streets around the perimeter of the school.

Plaintiffs' graphic display quickly caused concern among school officials. Defendant Art Roberts, an assistant principal at Dodson Middle School, identified traffic as one of his primary concerns. According to him, 85 to 95 percent of Dodson's 2000 students arrive by bus or car between 7:15 a.m. and 8:00 a.m. The students' arrival causes "heavy traffic" around the school. This traffic can become a safety hazard when drivers or pedestrians become upset, angry, or distracted. At a preliminary hearing, Roberts testified that during the time he had worked at Dodson Middle School, vehicles on streets around the school had struck five children and killed two.

On the day Plaintiffs were at Dodson Middle School, Assistant Principal Roberts observed some children stopping on the sidewalks and staring at the photographs of aborted fetuses, while others momentarily stood in the middle of the street. Faculty members also reported "abnormal" difficulty getting children onto the campus.

Assistant Principal Roberts identified additional concerns. He saw a number of children express anger over Plaintiffs' graphic display. He also overheard a group of boys planning to throw rocks at the truck. The group disbanded only after Roberts confronted them. Assistant Principal Roberts observed two or three girls crying. He also said that at least one class spent time discussing the truck's displayed images of aborted fetuses. Nevertheless, Assistant Principal Roberts said the school had a "fairly normal opening" and that all students he could see were on the campus by the start of classes at 8:01 a.m.

School officials contacted the Sheriff's Department at about 7:50 a.m. The dispatcher sent a text message to Deputy Sheriffs Mark Darling and Mark Repcik, who were driving separate vehicles. The message stated that an "[a]nti-abortion truck with offensive language and pictures is circling the school and videotaping the school and surrounding area." The

Sheriff's Department station desk also radioed Deputy Repcik and told him a "large white truck [was] driving [around] the middle school [with] very graphic pictures on the sides and [was] disrupting the school."

At 8:05 a.m., Deputy Sheriffs Darling and Repcik stopped Plaintiff Kulas, who was driving the display truck, and Plaintiff Padberg, who was driving the "security vehicle." According to Kulas, Deputy Darling told him that the Deputy Sheriffs stopped the two vehicles because they were "driving these pictures around the school with offensive language, and . . . scaring kids . . . ." During the stop, no Deputy Sheriff drew his gun or handcuffed Kulas or Padberg. The deputies allowed Kulas and Padberg to move freely about the immediate area and talk to each other for the duration of the stop.

Thirty minutes later, Deputy Sheriff Sergeant Xavier Aguilar arrived. According to Deputy Sheriffs Darling and Repcik, they summoned Sergeant Aguilar, their supervisor, to the scene because they had never dealt with a comparable situation. Deputy Sheriff Dave Despot, the liaison to Dodson Middle School, was also summoned to the scene. He arrived between fifteen and thirty minutes after Aguilar arrived. Despot took photographs of the security vehicle and the truck. He then went into the school to speak with Assistant Principal Roberts.

At some point, Deputy Sheriff Darling entered the security vehicle to activate the switch for the flashing red-and-amber lights. Then, with Padberg's permission, Darling searched the vehicle for weapons. The record does not indicate whether there were two discrete searches or only one.

Eventually, Assistant Principal Roberts accompanied Deputy Despot back to the scene, and, after reading California Penal Code § 626.8 to Kulas and Padberg, told them that they must leave the area around the school. Kulas and Padberg promptly left the area at 9:20 a.m. Plaintiffs assert that,

because of fear of arrest, they have taken their Reproductive Choice Campaign to only one other school in Los Angeles County since the March 24, 2003 incident.

## B.   Procedural History

Plaintiffs filed this 42 U.S.C. § 1983 suit on April 17, 2003. Their complaint seeks nominal damages from Assistant Principal Roberts, and from Deputy Sheriffs Repcik, Darling, Despot, and Sergeant Aguilar. Plaintiffs sought an injunction to restrain the four Deputy Sheriffs, Assistant Principal Roberts, Sheriff Baca (in his official capacity), and the Los Angeles County Sheriff's Department from enforcing § 626.8 against Plaintiffs' abortion speech activities. Finally, Plaintiffs sought a declaration that § 626.8 is unconstitutional as applied to Plaintiffs' activities. Plaintiffs do not seek monetary damages from the Sheriff's Department.

The district court granted the individual defendants'[1] motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), holding that these defendants were entitled to qualified immunity.[2] The district court dismissed Sheriff Baca as a redundant defendant. On February 10, 2005, the district court granted summary judgment for all defendants and denied summary judgment for Plaintiffs. This timely appeal followed.

## II.   STANDARD OF REVIEW

A district court's decision on cross-motions for summary

---

[1]The phrase "individual defendants," refers to the defendants sued in their individual capacity: Deputies Repcik, Darling and Despot, Sergeant Aguilar, and Assistant Principal Roberts.

[2]The district court did not specify whether qualified immunity applied only to the First Amendment claims or to all claims. The court declined to clarify the scope of its grant of immunity in the summary judgment order, instead holding that the issue was moot.

judgment is reviewed de novo. *ACLU of Nev. v. City of Las Vegas*, 466 F.3d 784, 790 (9th Cir. 2006). Construing the evidence in the light most favorable to the nonmoving party, we must determine whether genuine issues of material fact exist. *Id.* When presented with cross-motions for summary judgment, we review each motion for summary judgment separately, giving the nonmoving party for each motion the benefit of all reasonable inferences. *Id.* at 790-91.

## III.  FIRST AMENDMENT ISSUES

Plaintiffs contend that the application of § 626.8 under the circumstances presented here violated their First Amendment rights. We have serious concerns about the constitutionality of the statute as applied. We need not decide, however, whether the statute as applied is unconstitutional because we conclude that the California courts would construe the statute narrowly so as not to apply to Plaintiffs' conduct.

### A.  Applicability of Penal Code § 626.8

#### 1.  *First Amendment concerns*

Plaintiffs sought to express their anti-abortion message on a public street, a traditional public forum. *See Frisby v. Schultz*, 487 U.S. 474, 481 (1988) ("[A]ll public streets are held in the public trust and are properly considered traditional public fora."); *see also PeTA v. Rasmussen*, 298 F.3d 1198, 1204 (10th Cir. 2002) (holding that the sidewalks near a public school are a traditional public forum). Generally, content-based speech restrictions in public fora are subject to strict scrutiny. *Flint v. Dennison*, 488 F.3d 816, 830 (9th Cir. 2007).

[1] The government may, however, impose reasonable "time, place, or manner" regulations on speech in public fora, provided the regulations "are justified without reference to the content of the regulated speech, . . . are narrowly tailored to serve a significant governmental interest, and . . . leave open

ample alternative channels for communication of the information." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (quoting *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984)). We therefore first address whether the application of § 626.8 to Plaintiffs' display of photographs of aborted fetuses outside Dodson Middle School would qualify as a content-neutral time, place, or manner regulation. We conclude that it is questionable whether the statute, if it applies to Plaintiffs' conduct in this case, would satisfy the first criterion — that it be "justified without reference to the content of the regulated speech." *Id.*

**[2]** We previously noted that a law "is content-based if either the main purpose in enacting it was to suppress or exalt speech of a certain content, or it differentiates based on the content of speech on its face." *ACLU*, 466 F.3d at 793. Defendants argue that § 626.8 is content-neutral because it is justified by a purpose unrelated to the content of the message — namely, the "compelling interest in having an undisrupted school session conducive to the students' learning." *See Grayned v. City of Rockford*, 408 U.S. 104, 119 (1972).[3]

**[3]** The language of § 626.8 does not indicate an intent to suppress speech of a certain content. That lack of purpose, however, does not render application of the statute to Plaintiffs' speech content-neutral. If the statute, as read by the police officers on the scene, would allow or disallow speech

---

[3]We note that in this case, unlike in *Grayned*, the school setting alone does not justify the restriction applied to Plaintiffs. *Grayned* identified disruptions of "normal school activities" as "boisterous demonstrators who drown out classroom conversation, make studying impossible, block entrances, or incite children to leave the schoolhouse." *Grayned*, 408 U.S. at 118-19. Further emphasizing this focus on *classroom* interruption, *Grayned* noted with approval that the ordinance did not restrict "expressive activity before or after the school session, while the student/faculty 'audience' enters and leaves the school," *id.* at 120 — the precise situation presented here. The school setting here thus provides no authority to engage in otherwise impermissible restrictions.

depending on the reaction of the audience, then the ordinance would run afoul of an independent species of prohibitions on content-restrictive regulations, often described as a First Amendment-based ban on the "heckler's veto."[4] *See Bachellar v. Maryland*, 397 U.S. 564, 567 (1970) ("[I]t is firmly settled that under our Constitution the public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers, or simply because bystanders object to peaceful and orderly demonstrations.") (quotation marks and citations omitted); *see also, e.g.*, *Gooding v. Wilson*, 405 U.S. 518, 527 (1972); *Cox v. Louisiana*, 379 U.S. 536, 551-52 (1965); *Terminiello v. City of Chicago*, 337 U.S. 1, 4-5 (1949). Thus, as the Supreme Court has made clear, the government cannot silence messages simply because they cause discomfort, fear, or even anger:

> [I]n our system, undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression. Any departure from absolute regimentation may cause trouble. Any variation from the majority's opinion may inspire fear. Any word spoken, in class, in the lunchroom, or on the campus, that deviates from the views of another person may start an argument or cause a disturbance. But our Constitution says we must take this risk . . . .

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 508 (1969).

**[4]** The disruptions caused by the Plaintiffs' conduct were all a result of the students' reactions to Plaintiffs' message. Assistant Principal Roberts stated that he saw two or three girls cry and that he heard several angry boys discuss throw-

---

[4]The term "heckler's veto" first appeared in a footnote in *Brown v. Louisiana*, 383 U.S. 131, 133 n.1 (1966). We use this term to describe restrictions on speech that stem from listeners' negative reactions to a particular message.

ing rocks at Plaintiffs' truck. Roberts also stated that the faculty had more difficulty than normal getting children into classes. There is some evidence that students discussed Plaintiffs' display of images of first-term aborted fetuses during class time. Finally, the children did not go into the school as quickly as usual. Some students stopped in the street momentarily and stared at the truck, causing traffic congestion. These incidents were all reactions to the *message* displayed on Plaintiffs' truck.

In *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 134 (1992), the Supreme Court emphasized that "[l]isteners' reaction to speech is not a content-neutral basis for regulation" — in other words, the First Amendment does not permit a heckler's veto. *Forsyth County* struck down an ordinance as unconstitutionally content-based because the statute based parade fees on the estimated cost of maintaining public order during the event. Because the size of the fee "depend[ed] on the administrator's measure of the amount of hostility likely to be created by the speech based on its content," the ordinance unconstitutionally burdened speech that was "unpopular with bottle throwers." *Id.*

As the cases cited above indicate, *Forsyth County* was not the first or only case to hold that a regulation that depends upon listeners' reaction to speech is not a content-neutral regulation. In *Cox v. Louisiana*, for example, the Supreme Court held that police could not justify shutting down a civil rights demonstration on public sidewalks as a breach of the peace on the ground that there was a "fear of violence . . . based upon the reaction of the group of white citizens looking on from across the street." 379 U.S. at 550. Like *Forsyth County*, *Cox* rested on the premise that "constitutional rights may not be denied simply because of hostility to their assertion or exercise." *Id.* at 551 (quoting *Watson v. City of Memphis*, 373 U.S. 526, 535 (1963)).

The venerable heckler's veto line of cases does not align perfectly with a standard this court has recently used to help determine whether a regulation is content-based: whether "a law enforcement officer must read a [communication's] message to determine if the [communication] is exempted from the ordinance." *ACLU*, 466 F.3d at 795-96.[5]

[5] The "read the message" test, however, cannot encompass the universe of content-based statutes because the test does not fully account for the heckler's veto line of cases. Here, the government did not prospectively gauge the effect of the message (and ban it accordingly), but instead waited for, and then responded to, listeners' reactions. Whether prospectively, as in *Forsyth County*, or retrospectively, as in the case before us, the government may not give weight to the audience's negative reaction.[6]

[6] To account for *Cox* and similar cases, our inquiry must focus on the reason for the government's restriction of speech. If *listeners* react to speech based on its content and the government then ratifies that reaction by restricting the speech *in response to listeners' objections*, then the restriction is content-based. *Cf. Ovadal v. City of Madison*, 469 F.3d 625, 630 (7th Cir. 2006) (holding that the removal of a protester carrying large signs on busy highway overpass is content-based if his "*message* angered drivers who then reacted and were distracted from the task of driving safely" but content-neutral if his "*presence* on that day and under those driving conditions created a 'spectacle' that led some drivers to be distracted from the task of safely navigating the Beltline") (emphases in original).

---

[5]Whether an officer must read a message is persuasive evidence of an impermissible content-based purpose, but is not dispositive. *ACLU*, 466 F.3d at 796 n.12.

[6]There is, of course, an exception for certain "fighting words." *See Chaplinsky v. New Hampshire*, 315 U.S. 568, 573 (1942).

Nor is the reaction of listeners a secondary effect of speech that can be regulated under *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 46 (1986). *See Boos v. Barry*, 485 U.S. 312, 321 (1988) ("The emotive impact of speech on its audience is not a 'secondary effect.' "); *see also Crawford v. Lungren*, 96 F.3d 380, 385 (9th Cir. 1996) ("The Supreme Court has defined secondary effects as being correlated with, *but not directly a consequence of*, the impact of the speech.") (emphasis added).

Section 626.8, if it applied to Plaintiffs' conduct in this case, would appear to be just the kind of accession to the heckler's veto outlawed by the case law. Plaintiffs' speech was permitted until the students and drivers around the school reacted to it, at which point the speech was deemed disruptive and ordered stopped under § 626.8. This application of the statute raises serious First Amendment concerns.[7]

---

[7]We recognize that one of our sister circuits, in a case discussing a nearly identical statute, has held otherwise. In *PeTA v. Rasmussen*, 298 F.3d 1198 (10th Cir. 2002), an animal-rights organization staged a protest outside of a junior high school shortly before the end of classes; a counter-protest was also held. *Id.* at 1201. "The protests were not noisy, but some students allegedly were distracted, stayed late, missed their rides, or sought to interact with the protesters." *Id.* at 1202. The police directed the protesters to cease, citing a state statute substantively mirroring § 626.8. The statute did not apply to junior high schools, however, and the police subsequently admitted their mistake.

The Tenth Circuit nonetheless held that the misapplication of the statute was content-neutral:

> Although the defendants misapplied the statute to PeTA, their misapplication of the statute was unrelated to the content of PeTA's speech. The school also applied the ban to META [the counter-protesters], which expressed the opposite message from PeTA. Defendants' actions were thus content-neutral.

*Id.* at 1204. We disagree with this analysis. That the statute was applied to protesters on both sides of the issue demonstrates only that it was *viewpoint*-neutral. *See Boos*, 485 U.S. at 319. Shutting down dueling protests does not discriminate based on viewpoint, but is nonetheless a content-based heckler's veto if the reason for the restriction was that bystanders were uncomfortable with the controversial content of the messages.

We are mindful that this case involves a special circumstance, the presence of children. In particular, the evidence suggests that children were distracted by the Plaintiffs' pictures, and this distraction perhaps posed a danger as students crossed the streets around the school. Children may well be particularly susceptible to distraction or emotion in the face of controversial speech, and may not always be expected to react responsibly. These considerations, among others, might conceivably support the proposition that the heckler's veto principle is less sweeping where the targeted audience is children.

There is, however, no precedent for a "minors" exception to the prohibition on banning speech because of listeners' reaction to its content.[8] It would therefore be an unprecedented departure from bedrock First Amendment principles to allow the government to restrict speech based on listener reaction simply because the listeners are children. At the least, applying § 626.8 to Plaintiffs' speech in this case raises a novel constitutional issue. Unless we create a new exception to the "heckler's veto" doctrine (which we do not do), applying § 626.8 to Plaintiffs' speech would be unconstitutional.

We decline to create such an exception, in part because we can reasonably construe § 626.8 as not applicable to the present circumstances.[9] Where a construction of a statute would

---

[8]There is, however, at least one circumstance in which First Amendment standards have been specially tailored to protect children. *See Ginsberg v. New York*, 390 U.S. 629, 640-41 (1968) (relying on the state's interest "to protect the welfare of children and to see that they are safeguarded from abuses which might prevent their growth into free and independent well-developed men[, women] and citizens" to hold that it is permissible to protect children from being exposed to pornography that was not obscene) (internal quotations omitted).

[9]The California legislature may elect to draft a statute prohibiting disruptive messages outside school buildings where the disruption threatens the physical safety of school children while they are coming to, leaving, or attending school. We do not have before us, and therefore do not decide the constitutionality of, such a statute.

raise serious constitutional problems, courts "will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of [the legislature]." *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988).

Here, if § 626.8 applies only to disruptions caused by the *manner* and not the *content* of speech, our First Amendment concerns are resolved. A statute that restricts speech only when it is disruptive because of its manner, not its content, is an example of content-neutral regulation that has been affirmed time and again. In *Grayned*, for example, in dealing with an anti-noise ordinance, the Supreme Court upheld the regulation of speech that would — because of its high-decibel manner of communication, not its content — prevent classroom teaching or studying.[10] 408 U.S. at 119. Similarly, we have narrowed an injunction prohibiting "shouting, screaming, chanting, or yelling" during demonstrations outside an abortion clinic to specify that such conduct be enjoined only if it is "in a volume that substantially interferes with the provision of medical services within the [clinic]." *Portland Feminist Women's Health Ctr. v. Advocates for Life, Inc.*, 859 F.2d 681, 686-87 (9th Cir. 1988). This narrow interpretation ensured that the speech was enjoined only if its *manner* caused disruption to the clinic's services, rather than if its

---

[10]The ordinance at issue in *Grayned* is strikingly similar to § 626.8. The ordinance there prohibited "willfully mak[ing] or assist[ing] in the making of any noise or diversion which disturbs or tends to disturb the peace or good order of such school session or class thereof." 408 U.S. at 108. The Supreme Court rejected a constitutional challenge because it concluded that the state supreme court would construe the ordinance narrowly to prohibit "only actual or imminent interference with the 'peace or good order' of the school." *Id.* at 111-12. It further held that the ordinance was not "a vague, general 'breach of the peace' ordinance, but a statute written specifically for the school context, where the prohibited disturbances are easily measured by their impact on the normal activities of the school." *Id.* at 112. So construed, the ordinance "does not permit punishment for the expression of an unpopular point of view." *Id.* at 113.

*content* upset the patients or staff. Therefore, we must address whether § 626.8 applies only where the manner, not the content, of speech near schools is distracting to listeners. If so, we need not decide the constitutionality of a content-restrictive statute, for such a statute is not before us.

### 2.    *Construing § 626.8*

In similar circumstances — that is, to avoid deciding serious constitutional issues — federal courts have narrowly construed state or local statutes. *See, e.g.*, *Frisby*, 487 U.S. at 482; *Phelps v. Hamilton*, 59 F.3d 1058, 1070 (10th Cir. 1995) ("[Although] federal courts do not have the power to narrow a state law by disregarding plain language in the statute just to preserve it from constitutional attack . . . . , we are permitted to construe ambiguous state statutes and to extrapolate the true meaning of such statutes according to traditional rules of statutory construction, and then to judge the constitutionality of such statutes as so construed."); *Cohen v. City of Des Plaines*, 8 F.3d 484, 493 (7th Cir. 1993) (construing a city ordinance narrowly to avoid Establishment Clause problem); *see also Grayned*, 408 U.S. at 111-12 (construing local ordinance narrowly after concluding that the state supreme court would so construe the ordinance). In our view, the Supreme Court of California would, were the issue presented to them, construe § 626.8 to apply only to interference or disruption caused by the manner of a person's expressive conduct.

**[7]** California Penal Code § 626.8 provides, in relevant part:

> (a) Any person who comes into any school building or upon any school ground, or street, sidewalk or public way adjacent thereto, without lawful business thereon, and whose presence or acts interfere with the peaceful conduct of the activities of the school or disrupt the school or its pupils or school activities, is

guilty of a misdemeanor if he or she does any of the following:

> (1) Remains there after being asked to leave by the chief administrative official of that school or his or her designated representative, or by a . . . sheriff or deputy sheriff . . . .

> (2) Reenters or comes upon that place within seven days of being asked to leave by a person specified in paragraph (1).

> (3) Has otherwise established a continued pattern of unauthorized entry.

> *This section shall not be utilized to impinge upon the lawful exercise of constitutionally protected rights of freedom of speech or assembly.*

Cal. Penal Code § 626.8(a) (emphasis added).

As an initial matter, California courts regularly construe arguably ambiguous statutes narrowly to avoid First Amendment problems. In doing so, California courts have enunciated the principle that "the court should construe the enactment so as to limit its effect and operation to matters that may be constitutionally regulated or prohibited." *People v. Superior Court (Anderson)*, 151 Cal. App. 3d 893, 895-96 (Ct. App. 1984) (quoting *Welton v. City of Los Angeles*, 18 Cal. 3d 497, 505-06 (1976)). For example, in *In re Manuel G.*, 16 Cal. 4th 805, 814 (1997), the California Supreme Court considered a statute imposing criminal penalties on "[e]very person who attempts, by means of any threat or violence, to deter or prevent an executive officer from performing any duty imposed upon such officer by law . . . ." The court agreed with lower court decisions narrowly construing the statute: "To avoid the risk of punishing protected First Amendment speech, . . . the

term 'threat' has been limited to mean a threat of unlawful violence used in an attempt to deter the officer." *Id.* at 814-15; *see also People v. Zimmerman*, 15 Cal. App. 4th Supp. 7, 12 (Ct. App. 1993) ("A statute challenged for overbreadth is not void if its terms are reasonably susceptible to an interpretation consistent with the Constitution."); *City & County of San Francisco v. Eller Outdoor Adver.*, 192 Cal. App. 3d 643, 663 (Ct. App. 1987) ("It is the duty of the courts, wherever possible, to construe a statute in a manner which is reasonable, consistent with the statutory purpose, and eliminates doubts as to its constitutionality."); *Loska v. Superior Court*, 188 Cal. App. 3d 569, 584 (Ct. App. 1986) ("In order to save the ordinance as a whole, we 'construe the enactment so as to limit its effect and operation to matters that may be constitutionally . . . prohibited.' ") (alteration in original, quoting *Welton*, 18 Cal. 3d at 505).

**[8]** Here, a narrowing construction is invited by the plain language of § 626.8: "This section shall not be utilized to impinge upon the lawful exercise of constitutionally protected rights of freedom of speech or assembly." The California legislature thus contemplated the possibility that § 626.8 might, if construed broadly, apply to constitutionally protected speech, and sought to prevent such an application. Further, the exclusionary clause is drafted expansively, barring applications that "impinge," rather than "violate," protected speech. Thus, the legislature seemingly meant to make the statute inapplicable where First Amendment rights are possibly affected, even if the statute *could* validly restrict those rights.[11]

---

[11]The California legislature sometimes drafts First Amendment savings clauses more narrowly, so as merely to limit the statute to what is constitutionally permissible. For instance, California Penal Code § 420.1 provides that it "shall not apply to . . . any person who is engaging in activities protected by the California Constitution or the United States Constitution." The same "shall not apply to" language is used in Penal Code §§ 602(o), 602.1, and 602.8. Similarly, Penal Code § 646.9(f)-(g) provides that "[c]onstitutionally protected activity is not included within the meaning of" certain terms in the statutory definition of the crime. This "shall not apply" and "is not included" language is narrower than the broad "shall not be used to impinge" language in the statute at issue here. We should give effect to this difference.

**[9]** Finally, apart from the exclusionary clause, the language of § 626.8 suggests that it was intended to apply to manner rather than content of speech. Section 626.8 applies where the "presence" or "acts" of a person "interfere[s]" with the school's activities or "disrupt[s] the school or its pupils." The terms "presence" and "acts" indicate that § 626.8 is concerned with the physical aspects of a speaker's behavior, *not* with the content of his speech. Similarly, the words "interfere" and "disrupt" are active verbs that focus on the behavior of the speaker, not on the reaction of the listeners.

**[10]** As a whole, the language of § 626.8 does not evidence any intent to criminalize a person's behavior based on a listener's reaction to the content of his speech. We thus conclude that the California courts would construe § 626.8 to apply to speech only when the disruption caused by the speaker is caused by the *manner* of the speech. Controversial words and images that, because of their content, upset the listener and cause the *listener* to behave disruptively are not covered by the statute.

**[11]** Under our narrow construction, § 626.8 does not apply to Plaintiffs' conduct in driving their trucks around Dodson Middle School. That conduct was disruptive only because of the audience's reaction to the content of the speech. Children became upset, a few boys talked about throwing rocks, other children stood in the middle of the street and slowed the entry of students into school, and at least one class spent time discussing the photos of fetuses instead of their prescribed school work. All of these reactions were triggered by the upsetting message on the truck — not by noise, or physical obstruction, or any other aspect of Plaintiffs' activities. Construing § 626.8 as we do, the statute provided no basis to prohibit Plaintiffs from continuing to drive their vehicles around the school before classes began.

**[12]** Section 626.8 was the only authority cited by Defendants in asking Plaintiffs to leave, and thus provided the only

possible source of a significant governmental interest necessary to restrict Plaintiffs' speech in a public forum. *See Ward*, 491 U.S. at 791-92. Misapplying a statute is not a significant governmental interest. Defendants have suggested no other significant governmental interest to justify restricting Plaintiffs' speech. We therefore hold that the Deputy Sheriffs violated Plaintiffs' First Amendment right of free speech.

## B.   Qualified Immunity

We next consider whether the district court correctly determined that the individual defendants were entitled to qualified immunity for Plaintiffs' First Amendment claims.[12] We review a grant of qualified immunity de novo. *Bias v. Moynihan*, 508 F.3d 1212, 1218 (9th Cir. 2007).

[13] Qualified immunity involves a two-step inquiry: (1) whether the officer's conduct violated a constitutional right; and (2) whether that right was clearly established when viewed in the context of this case. *See Ganwich v. Knapp*, 319 F.3d 1115, 1119 (9th Cir. 2003) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). As discussed above, Plaintiffs have established that Defendants violated their constitutional rights. We must therefore decide whether those rights were clearly established.

A right is clearly established if its contours are "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Saucier*, 533 U.S. at 202 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Even if the right is clear, however, we must determine whether the officers made a reasonable mistake about the law's requirements. *See id.* at 205.

---

[12]As noted above, it is not entirely clear whether the district court decided this issue on the merits.

**[14]** Here, it was clear that the officers could not apply a time, place or manner restriction on speech to the Plaintiffs' activities around the school without advancing any significant state interest by doing so. But the officers could have made a reasonable mistake in believing that § 626.8 applied to Plaintiffs' conduct and thus advanced a significant state interest. *Grossman v. City of Portland*, 33 F.3d 1200, 1209 (9th Cir. 1994) ("[A]n officer who acts in reliance on a duly-enacted statute or ordinance is ordinarily entitled to qualified immunity."). There was no case law determining whether § 626.8 does or does not apply to the circumstances the officers faced. *See Dittman v. California*, 191 F.3d 1020, 1027 (9th Cir. 1999) (defendant entitled to qualified immunity where she "acted pursuant to a duly enacted state statute" and "there was no clear case law in either the federal courts or the state courts of California establishing that" the statute may not be applied in the challenged manner); *see also Way v. County of Ventura*, 445 F.3d 1157, 1166 (9th Cir. 2006) (Wardlaw, J., concurring) (defendants entitled to qualified immunity where they relied on police policy and state statute in conducting unconstitutional strip-search because "the policy and the state statute had not fallen into desuetude, nor were they patently violative of fundamental constitutional principles") (citation and quotation marks omitted). And, although we believe that our reading of the statute is one California courts would adopt, that conclusion is premised in part on the practice of avoiding unconstitutional interpretations of statutes, not solely on the language of the statute.

**[15]** Moreover, as we have noted, there is some question whether the heckler's veto consideration applies where the target audience consists of children. As far as we have been able to determine, there is no case law holding either that it does or that it does not. In these circumstances, we cannot conclude that the law was sufficiently clear that a reasonable officer would know that it was unlawful to request the Plaintiffs to cease driving their truck around the area. *See Hope v. Pelzer*, 536 U.S. 730, 741 (2002) (relevant inquiry is whether

"the state of the law [at the relevant time] gave [defendants] fair warning that their [conduct] was unconstitutional"); *Porter v. Bowen*, 496 F.3d 1009, 1026 (9th Cir. 2007) (qualified immunity where court itself "had to wrestle with difficult and unsettled questions about the First Amendment interests implicated by [plaintiffs' conduct] and the weight of the countervailing interests asserted by the State"). We therefore affirm the district court's conclusion that the individual defendants are entitled to qualified immunity on the First Amendment claim.

## C.   Summary of First Amendment Claim

California Penal Code § 626.8, read as we believe a California court would construe it, does not apply to Plaintiffs' expressive activities in driving their trucks around Dodson Middle School. Thus, the officers' order that Plaintiffs leave the area around Dodson Middle School violated Plaintiffs' First Amendment rights. The individual defendants, however, have qualified immunity from a damages action. As this immunity does not extend to injunctive relief, *see Hydrick v. Hunter*, 500 F.3d 978, 988 (9th Cir. 2007), we remand for the district court to consider Plaintiffs' request for injunctive relief in light of our First Amendment holding.

## IV.   FOURTH AMENDMENT CLAIMS

We now address Plaintiffs' Fourth Amendment claims. Plaintiffs contend that the Deputy Sheriffs violated their Fourth and Fourteenth Amendment rights by unreasonably detaining Kulas and Padberg for seventy-five minutes. Plaintiffs also claim that the Deputy Sheriffs searched the security vehicle without securing Kulas's or Padberg's consent. We review de novo the lawfulness of a search or seizure, *United States v. Stafford*, 416 F.3d 1068, 1073 (9th Cir. 2005), and address each claim in turn.

### A.   The Seventy-Five Minute Detention

Plaintiffs contend that their seventy-five minute detention at the scene was unreasonably long and therefore violated their Fourth Amendment rights. We agree.

[16] A dispatcher's call to the Deputy Sheriff indicated that a large white truck was disturbing Dodson Middle School and that the truck was accompanied by a vehicle similar to a police cruiser. Based on this information, the Deputy Sheriffs had reasonable suspicion to believe Kulas and Padberg may have been violating several California Vehicle Code provisions.[13] *See Hiibel v. Sixth Judicial Dist. Court*, 542 U.S. 177, 185 (2004) (requiring that investigative stops be predicated on reasonable suspicion to believe further investigation may produce evidence that the person is involved in criminal activity). Because there was reasonable suspicion, the initial investigative stop was proper.

[17] Once the sheriffs validly initiated an investigative stop, no rigid time constraints governed its duration, so long as the sheriffs acted diligently and pursued a means of investigation likely to confirm or dispel their suspicions quickly. *United States v. Sharpe*, 470 U.S. 675, 686 (1985). Here, although a brief detention to investigate possible Vehicle Code violations was warranted, that investigation should have taken no more than a few minutes — enough time to examine the security vehicle and to determine if there were any outstanding warrants involving the vehicle or its occupants.[14]

---

[13]*E.g.*, Cal. Veh. Code § 25268 (prohibiting display of "a flashing amber warning light on a vehicle"), § 25269 (prohibiting display of "a flashing or steady burning red warning light on a vehicle"), § 25279(b) (private security vehicles can use flashing amber lights only if vehicle is clearly marked as private security), § 27605 (prohibiting ownership and operation of a vehicle painted to resemble a police car).

[14]Defendants suggest that the detention was also reasonable because of potential violations of two California Education Code provisions: § 32210

Defendants argue that the seventy-five minute detention was justified by their reasonable suspicion that Plaintiffs violated California Penal Code § 626.8. But a person is only guilty of a crime pursuant to § 626.8 if they (1) remain at a school *after being asked to leave*; (2) reenter within seven days of being asked to leave; or (3) engage in a "continued pattern of unauthorized entry." Plaintiffs did none of these things. They were not asked to leave until the *end* of the seventy-five minute detention, at which point they promptly left. So, with respect to § 626.8, the officers *at no time* had any reason to suspect that the Plaintiffs had committed or were about to commit this crime.[15]

There is a second reason why the length of the detention was not justified by reasonable suspicion. Much of the detention time was spent waiting for the Deputy Sheriffs' supervisor to come to the scene to assist with this novel situation. But once it became clear that no Vehicle Code violations had taken place, the Deputy Sheriffs were no longer authorized to detain Plaintiffs based on a reasonable suspicion that any par-

---

("Any person who willfully disturbs any public school or any public school meeting is guilty of a misdemeanor. . . .") and § 44811 ("[A]ny . . . person whose conduct in a place where a school employee is required to be in the course of his or her duties materially disrupts classwork or extra-curricular activities or involves substantial disorder is guilty of a misdemeanor."). These provisions also might justify a brief detention. But, as with the suspected Vehicle Code violations, there is no explanation of why it would take seventy five minutes to investigate them. Presumably, just speaking to Plaintiffs and school officials would be sufficient.

[15]That Plaintiffs did not commit a crime under § 626.8 does not impact the potential application of the statute to their First Amendment rights. The statute proceeds in two parts: First, faced with conduct that interferes with or disrupts a school, an officer can order the disrupting person to leave, on pain of prosecution if he does not. If applicable to protected speech activity, this order would itself impact First Amendment rights. Second, only if the person refuses to leave when ordered to do so can he be charged with a crime. Because Plaintiffs left immediately after being ordered to do so, they never committed a crime under § 626.8.

ticular crime had been committed. Instead, the Deputy Sheriffs continued to detain plaintiffs because they were waiting for their supervisors to help them figure out *whether* any crime had been committed.

This basis for continued detention does not comport with Fourth Amendment standards. The investigative purposes permitted by detention are ones of fact, not law. *See Michigan v. Summers*, 452 U.S. 692, 700 n.12 (1981) (listing some investigative techniques that may be used during a *Terry* stop: "interrogation[;] . . . communicat[ion] with others, either police or private citizens, in an effort to verify the explanation tendered or to confirm the identification or determine whether a person of that identity is otherwise wanted[;] . . . [and determination of whether] in fact an offense has occurred in the area"). Thus, an officer's uncertainty about the law cannot excuse the detention. To permit otherwise "would remove the incentive for police to make certain that they properly understand the law that they are entrusted to enforce and obey." *See United States v. Lopez-Soto*, 205 F.3d 1101, 1106 (9th Cir. 2000); *see also United States v. Tibbetts*, 396 F.3d 1132, 1138 (10th Cir. 2005) ("[F]ailure to understand the law by the very person charged with enforcing it is *not* objectively reasonable.") (emphasis in original); *cf. United States v. Booker*, 496 F.3d 717, 722 (D.C. Cir. 2007) ("Unlike stops premised on mistakes of fact, '[s]tops premised on a mistake of law, even a reasonable, good-faith mistake, are generally held to be unconstitutional.' ") (alteration in original) (quoting *United States v. Coplin*, 463 F.3d 96, 101 (1st Cir. 2006)).

**[18]** In sum, neither California Penal Code § 626.8 nor the search for other code provisions that might have been violated justified the Deputy Sheriffs in detaining the Plaintiffs for seventy-five minutes while the sheriffs tried to find some basis for charging them. Consequently, we hold that the deputies' detention of Kulas and Padberg violated their Fourth and Fourteenth Amendment rights. Accordingly, we reverse both the district court's grant of summary judgment in favor of

Defendants and the district court's denial of summary judgment for Plaintiffs with respect to this issue.

## B.    Search of Security Vehicle

Plaintiffs also maintain that the Deputy Sheriffs violated their Fourth Amendment rights by improperly searching Plaintiffs' security vehicle. Defendants contend that the deputies had the consent of Kulas and Padberg and, in any event, the Deputy Sheriffs acted pursuant to California Vehicle Code § 2806, which permits inspection of vehicles suspected of violating the Vehicle Code. We conclude that Plaintiffs have raised a genuine issue of material fact as to whether the deputies violated their Fourth Amendment rights.

At the outset, we note a significant factual dispute. Padberg claimed that deputies searched the security vehicle twice, but only secured consent for the second search. Deputies Repcik and Darling remember only one search, and claim they had permission. The recording from the security vehicle's camera does not clearly identify how many times the deputies entered the vehicle, or whether they had consent. This conflicting testimony raises a credibility question that only the factfinder can resolve. *See Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997). For our review of the district court's grant of summary judgment for Defendants, we assume that the Plaintiffs' version of events is true. *See Moreno v. Baca*, 431 F.3d 633, 638 (9th Cir. 2005).

Thus, for the purposes of this appeal, we accept Plaintiffs' assertion that two searches took place, and that the first was not supported by consent. We must therefore evaluate whether the first search violated Plaintiffs' Fourth Amendment rights. Defendants cite California Vehicle Code § 2806 as justification for this search. We conclude that, absent consent, the search was improper.

Section 2806 provides as follows:

> Any . . . deputy sheriff . . . having reasonable cause to believe that any vehicle or combination of vehicles is not equipped as required by this code or is in any unsafe condition as to endanger any person, may require the driver to stop and submit the vehicle or combination of vehicles to an inspection and those tests as may be appropriate to determine the safety to persons and compliance with the code.

Cal. Veh. Code § 2806. The deputies entered Plaintiffs' security vehicle to determine whether the flashing lights could be activated. They now contend that their entry was necessary to ensure that the vehicle complied with the Vehicle Code.

[19] We addressed the validity of § 2806 searches in *United States v. Portillo*, 633 F.2d 1313 (9th Cir. 1980). In *Portillo*, a police officer opened a vehicle's trunk to identify the cause of a broken rear brake light. *Id.* at 1315. We upheld the search, reasoning that § 2806 allowed police to enter a vehicle to discover the cause of a potentially dangerous condition: in that case, the possibility that the car's electrical wiring had degraded. *See id.* at 1318-19. We also cautioned, however, that the defect justified entry because it "was not only a code violation, but a threat to the safety of persons on the highway" and that further inspection might either provide an easy remedy or identify more serious safety concerns. *Id.* at 1319.

[20] *Portillo* does not legitimize the search of Plaintiffs' security vehicle. A search's reasonableness depends on "the degree to which it intrudes upon an individual's privacy, and . . . the degree to which it is needed for the promotion of legitimate governmental interests." *United States v. Knights*, 534 U.S. 112, 118-19 (2001) (quoting *Wyoming v. Houghton*, 526 U.S. 295, 300 (1999)). Unlike *Portillo*, the existence of the flashing lights here does not suggest any hidden cause that might be a more serious safety hazard, and further inspection of the lights would not likely expose more serious code violations. None of the Vehicle Code sections cited by the Deputy

Sheriffs turn on whether the lights are *capable* of activation. Thus, entry to activate the lights would not further the government's interests.[16] We therefore hold that, absent consent, this search unreasonably intruded on Plaintiffs' Fourth Amendment rights.[17]

## C.  Qualified Immunity

We now consider whether the Deputy Sheriffs are entitled to qualified immunity on the Fourth Amendment issues. We conclude that they are not.

### 1.  *Liability for the Unreasonable Detention*

[21] The deputies cannot receive qualified immunity for their unreasonably lengthy detention of Kulas and Padberg. The deputies' constitutional duty to act diligently and pursue a means of investigation likely to confirm or dispel their suspicions quickly was clearly established on the date of the detention in this case. *See Sharpe*, 470 U.S. at 686. Moreover, it should have been readily apparent to a reasonable officer that § 626.8 provided no basis for a detention, as no violation of the statute occurred unless the Plaintiffs stayed on the premises after being asked to leave. It was also apparent that calling school liaison Deputy Sheriff Despot or Assistant Principal Roberts was not likely to quickly confirm or dispel

---

[16]The Sheriff's Department also argues that the light switch was in plain view. That the switch was visible does not justify entry to flip the switch without some independent justification for entering the vehicle.

[17]To the extent consent existed for each search, we reject Plaintiffs' contention that the consent was not voluntary. "Whether consent to search was voluntarily given is 'to be determined from the totality of all the circumstances.' " *United States v. Patayan Soriano*, 361 F.3d 494, 501 (9th Cir. 2004) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973)). We find nothing in the record that suggests coercion. The only factor militating against voluntariness is the deputies' failure to advise Kulas and Padberg of their right to refuse consent. This alone does not show that their consent was involuntary. *See Schneckloth*, 412 U.S. at 227.

any suspicion of wrongdoing. Moreover, neither Despot's nor Roberts's presence was necessary to enforce § 626.8. As the unlawfulness of their actions was apparent, the deputies are not entitled to qualified immunity. *See Hope*, 536 U.S. at 739.

### 2. *Liability for Searches of the Security Vehicle*

[22] Assuming Plaintiffs' allegations to be true, we conclude that the deputies do not have qualified immunity for the first search of the security vehicle. The deputies acted under authority given by California Vehicle Code § 2806, under which we have previously upheld warrantless searches of vehicles. *See Portillo*, 633 F.2d at 1318-19. *Portillo*, however, clearly warned that police may only search a vehicle under § 2806 when there is reasonable cause to believe inspection may uncover evidence of either potentially dangerous conditions or more serious code violations. *See id.* at 1319. Entering the vehicle to turn on the lights was not likely to provide information about either. Thus, the Sheriff's Deputies are not entitled to qualified immunity.

### D.   Summary of Fourth Amendment Claims

[23] Entry of summary judgment for the Sheriff's Department defendants was improper. The deputies violated Plaintiffs' rights by unreasonably detaining them at the scene. Moreover, Plaintiffs have raised a genuine issue of material fact with regard to whether the deputies unlawfully entered their security vehicle. Finally, we conclude that the individual deputies are not entitled to qualified immunity on summary judgment. Accordingly, we reverse the district court's grant of summary judgment for Defendants on both Fourth Amendment claims. We also reverse the district court's denial of summary judgment for Plaintiffs on the unreasonable detention claim.

## V.  DISMISSAL OF SHERIFF BACA

We affirm the district court's dismissal of Sheriff Baca. An official capacity suit against a municipal officer is equivalent to a suit against the entity. *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985). When both a municipal officer and a local government entity are named, and the officer is named only in an official capacity, the court may dismiss the officer as a redundant defendant. *See Busby v. City of Orlando*, 931 F.2d 764, 776 (11th Cir. 1991). Thus, Sheriff Baca is a redundant defendant.[18]

## VI.  CONCLUSION

For the foregoing reasons, we hold that Plaintiffs' First Amendment rights were violated. The individual defendants, however, are entitled to qualified immunity from a damages action on this issue. Accordingly, we reverse the district court's grant of summary judgment for defendants and the denial of summary judgment for Plaintiffs on the First Amendment issue. We affirm the district court's dismissal of the damages action against the individual defendants on qualified immunity grounds on the First Amendment issue but remand for consideration of injunctive relief. We also affirm the district court's dismissal of Sheriff Baca.

We also hold that Plaintiffs have conclusively shown a violation of their Fourth Amendment rights because of the unreasonable length of Kulas and Padberg's detention. Moreover, Plaintiffs have raised a genuine issue of fact as to whether the Deputy Sheriffs unlawfully entered their security vehicle. We therefore reverse the district court's grant of summary judgment for Defendants on both Fourth Amendment claims and

---

[18]Plaintiffs argue that Baca is not a redundant defendant because the Sheriff's Department may have sovereign immunity. Plaintiffs, however, misstate the law: Local government entities do not have sovereign immunity. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 n.54 (1978).

reverse the district court's denial of summary judgment for Plaintiffs on the unreasonable detention issue.

We remand for further proceedings consistent with this opinion. In particular, we leave it to the district court to address, in light of this opinion, Plaintiffs' conspiracy claim and Plaintiffs' request for injunctive relief.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED. EACH SIDE TO BEAR ITS OWN COSTS.**